Lufkin Foundry and Machine Company v. Commissioner. Lufkin Foundry and Machine Company International v. Commissioner.
Lufkin Foundry & Mach. Co. v. Commissioner
Docket No. 1333-68, 1334-68.
United States Tax Court
T.C. Memo 1971-101; 1971 Tax Ct. Memo LEXIS 231; 30 T.C.M. (CCH) 400; T.C.M. (RIA) 71101; May 12, 1971, Filed Thomas M. Haderlein, John C. Klotsche andmarcellus R. Meek, Suite *232 700, Prudential Plaza, Chicago, Ill., for the petitioners. Harold Friedman, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined the following Federal income tax deficiencies against the petitioners in these consolidated cases: Petitioner
Docket No.
Year
Amount
Lufkin Foundry and Machine Company
1333-68
1961
$ 82,360.72
1962
130,004.67
Lufkin Foundry and Machine Company International
1334-68
1961
10,156.38
1962
29,261.33
The issues for decision are: (1) Whether respondent erred in determining that a portion of the commissions paid by Lufkin Foundry and Machine Company to Lufkin Foundry and Machine Company International and Lufkin Overseas Corporation, S.A., during 1961 and 1962 constituted an improper shifting of income to those corporations by Lufkin Foundry and Machine Company under section 482; [1] (2) whether respondent erred in determining that a portion of the discounts granted by Lufkin Foundry and Machine Company to Lufkin Foundry and Machine Company International during 1961 and 1962 constituted an improper shifting of income under section 482; and (3) whether petitioner, *233 Lufkin Foundry and Machine Company International, qualified as a Western Hemisphere trade corporation within the meaning of section 921 during 1961 and 1962. Findings of Fact Some of the facts have been stipulated by the parties and are found accordingly. Lufkin Foundry and Machine Company (herein called Lufkin) is a corporation organized under the laws of the State of Texas whose principal office was located at 407 Kiln Avenue, Lufkin, Texas, at the time it filed its petition herein. Lufkin was incorporated on March 4, 1902. Lufkin maintained its books and filed its Federal income tax returns for the taxable years ended December 31, 1961, and December 31, 1962, on an accrual basis of accounting. Its corporate income tax returns for each of the years 1961 and 1962 were filed with the district director of internal revenue, Dallas, Texas. Lufkin Foundry and Machine Company International (herein called Lufkin International) is a corporation organized under the laws of the State of Texas whose principal office was located at 407 Kiln Avenue, Lufkin, Texas, at the *234 time it filed its petition herein. Lufkin International maintained its books and filed its Federal income tax returns for the taxable years ended December 31, 1961, and December 31, 1962, on an accrual basis of accounting. Its corporate income tax returns for 1961 and 1962 were filed with the district director of internal revenue, Dallas, Texas. Lufkin is engaged principally in the business of manufacturing and selling oil field pumping units, truck trailers, marine and industrial gears, oil field equipment and other related types of machinery and equipment and spare and replacement parts therefor. Lufkin's operations are divided into three divisions: the trailer division, the mill supply division and the machinery division. Oil field pumping units are the principal 402 product manufactured by the machinery division and the principal product sold by Lufkin in export. Lufkin manufactures four basic types of oil field pumping units: an air balanced unit, a beam balanced unit, a crank balanced unit and a Mark II Unitorque unit. The Mark II Unitorque unit is a variation of the crank balanced unit. The basic difference between the four types of pumping units relates to what is known *235 as the counterbalancing system. The object of counterbalance in a pumping unit system is to make maximum utilization of the overall available energy. Different types of units can better utilize input energy depending on the various conditions of the oil well such as the depth and the desired fluid production. There are numerous sizes and combinations of Lufkin oil field pumping units within the four basic types. The conventional crank balanced unit alone has at least one hundred variations. During 1961 and 1962 the price range on Lufkin oil field pumping units ranged from $600 to $800 for the smallest unit to $35,000 to $38,000 for the largest, exclusive of the prime mover and freight and installation charges. During 1961 and 1962, Lufkin was in competition for the sale of its pumping units, both domestically and in export with companies such as Oil Well Supply Co. (U.S. Steel), Continental Emsco Co. (Youngstown Steel) and National Supply Co. (Armco Steel) domestically and Wuffel, Legrande and SIAM in foreign areas. Lufkin, however, ranked first in worldwide sales during this period. From 1927 to 1949, Lufkin conducted its export operations exclusively through an export agent, *236 A. V. Simonson. Mr. Simonson was an independent agent operating out of New York City, with no employees or agents outside the United States selling Lufkin equipment. In addition to Lufkin pumping units, Mr. Simonson acted as an agent on behalf of other companies including Gaso Pump and Burner Manufacturing Company, Franks Manufacturing, Buda Engines, and Centure Geophysical Company. Mr. Simonson's activities generally involved visiting customers in the New York area. He did not prepare specifications or make quotations for Lufkin equipment. During this period, Lufkin's major export customers of oil field pumping units were Standard Oil of New Jersey, Shell Oil Company and Texaco. Field personnel of the customer played a very limited role in purchasing Lufkin pumping units. Generally, people in the field would provide the New York purchasing office of the customer with minimal well conditions which would be passed on to Mr. Simonson in New York for transmission to Lufkin, Texas. A recommendation for a specific unit would be made to the New York purchasing office of the customer which would be sent to the field. Often the field personnel would then request further recommendations. *237 Basically, field personnel of the customer did not specify Lufkin units and were not involved in the actual purchasing of Lufkin pumping units. The lack of specifications from the field created a multitude of problems in furnishing the customer with appropriate equipment. Organization of Lufkin Subsidiaries Lufkin organized and, at all times pertinent hereto, owned all of the outstanding capital stock of the following corporations: Place of
Year of
Incorpo-
Incorpo-
Name
ration
ration
Lufkin Machine Co. Ltd.
Canada
1949
Lufkin Foundry and Machine Company International
Texas
1954
Lufkin Overseas Corporation, S.A.
Venezuela
1958 The first subsidiary corporation formed by Lufkin to engage in international business was Lufkin Machine Co. Ltd. (herein called Lufkin Canada), a Canadian corporation organized on November 19, 1949. The organization of Lufkin Canada was precipitated by Imperial Oil Company, a subsidiary of Standard Oil of New Jersey. Imperial Oil Company indicated to Lufkin that if Lufkin wished to do business with Imperial Oil Company in the new oil fields in Western Canada, Lufkin would have to provide a warehouse for parts, servicemen *238 familiar with the equipment, personnel capable of specifying proper equipment, and all other facilities necessary to maintain oil field pumping units. Lufkin initially hired an independent agent in Canada to perform these functions but this arrangement did not work out satisfactorily and Lufkin Canada was thereupon organized. Although Lufkin was hesitant to organize a new company in Canada, Lufkin 403 Canada was formed as a separate subsidiary corporation rather than as a branch of Lufkin. Lufkin was advised by its attorneys that such a separate vehicle would be desirable to insulate the assets of Lufkin from potential liability arising out of Canadian activities. Lufkin was also advised that from an accounting standpoint a separate corporate vehicle would be desirable in Canada. Immediately after the formation of Lufkin Canada, Charles Dyer was sent to Edmonton, Alberta, Canada, as manager of Lufkin Canada. Mr. Dyer had been a sales engineer for Lufkin working in the Eldorado, Arkansas, area. Mr. Dyer hired an associate, purchased land and a warehouse facility and ordered a stock of pumping units and parts from Lufkin. Lufkin Canada initially serviced the areas of Devon La *239 Duc and Red Water which are 30 and 50 miles, respectively, from Edmonton. Later, Pemberton, which is approximately 100 miles from Edmonton, was also serviced by Lufkin Canada. From February 21, 1950, to May 1, 1954, Lufkin Canada purchased Lufkin pumping units and spare and replacement parts from Lufkin for resale in Western Canada. All purchases of Lufkin equipment by Lufkin Canada were made pursuant to a sales and service agreement between the parties dated February 21, 1950 (herein referred to as Lufkin Canada Agreement). Pursuant to the Lufkin Canada Agreement, Lufkin appointed Lufkin Canada as its exclusive distributor of Lufkin equipment in Western Canada and granted to Lufkin Canada the right to purchase Lufkin pumping units and parts at list price less 10 percent, F.O.B. Lufkin, Texas. The agreement of February 21, 1950, provided that sales to Lufkin Canada were to be on a "thirty-day net basis" with no cash discount to be allowed, that Lufkin Canada was to assume all responsibility for all credit extended and for the collection of payments due on the sale of Lufkin pumping units and repair parts from their stock. Lufkin Canada further agreed to sell Lufkin equipment in *240 accordance with published prices formulated by Lufkin, to furnish "suitable warehousing facilities," and to furnish service for all Lufkin products. Under the above-described distributorship agreement, Lufkin Canada promoted, warehoused, sold, installed, and serviced Lufkin products within its territory on the basis of the "sales discount" granted by Lufkin. While the sales price of equipment fluctuated, the basic 10 percent discount earned by Canada remained in effect throughout the period relevant to this case including all of 1961 and 1962. Several factors were involved in establishing this pricing arrangement between Lufkin and Lufkin Canada. The discount rate was set as low as possible with a view to retaining as much profit as possible in the United States. Additionally, the low discount rate was to some extent governed by Canadian tax considerations and the 10 percent discount rate was found to be acceptable to the Canadian tax authorities. Also, other factors were involved in determining the pricing arrangement between Lufkin and Lufkin Canada. These included the anticipated cost involved in servicing the territory and the cost of warehousing and warehousemen. From 1949 *241 to 1954, L.A. Little, vice president of sales for Lufkin and president of Lufkin Canada, made a number of trips to Canada to promote the sale of Lufkin equipment. Lufkin Canada never paid Mr. Little a salary and substantially all of Mr. Little's costs and expenses were absorbed by Lufkin. The second subsidiary corporation organized by Lufkin to engage in international business was Lufkin International, a corporation organized under the laws of the State of Texas on February 15, 1954. Lufkin International was formed by Lufkin to qualify as a Western Hemisphere trade corporation under section 921 of the Internal Revenue Code of 1954. Prior to the organization of Lufkin International, many of the major oil companies were locating extremely competent, technical personnel in the oil fields of Latin America. These people were specifying and writing requisitions for oil field equipment. It was therefore thought necessary for Lufkin to send qualified technical personnel to the field to encourage specification of Lufkin equipment. The major oil companies operating in Latin America also were demanding a supply of repair and replacement parts which necessitated local *242 warehousing facilities. Venezuela was a principal location in Latin America of major oil production. As a result of these developments, Lufkin decided to establish operations in Venezuela. The decision to utilize a separate subsidiary corporation to conduct operations in Venezuela was motivated by some of the same considerations involved in the organization of Lufkin Canada. Moreover, 404 Lufkin management desired to take advantage of the tax benefits afforded to Western Hemisphere trade corporations as a result of legislation enacted by Congress. Thus, a separate domestic corporation was necessary and Lufkin International was organized under the laws of Texas for this purpose. Immediately after the formation of Lufkin International, a sales engineer was dispatched to Venezuela and a warehouse in Maracaibo was acquired and stocked with Lufkin parts. A Venezuelan national was employed as a warehouseman. On February 15, 1954, Lufkin and Lufkin International entered into an agreement (herein referred to as Lufkin International Agreement) whereby Lufkin granted to Lufkin International the exclusive right to sell Lufkin equipment in the entire Western Hemisphere outside the United *243 States. The Lufkin International agreement further provides: Sales Activities INTERNATIONAL agrees to maintain personnel located abroad in numbers commensurate with the sales efforts justified by the market for Lufkin products. It is agreed by and between the parties hereto that the most effective method of selling to foreign customers is by constant and vigorous personal contact with the customer by INTERNATIONAL's personnel. INTERNATIONAL's personnel will call on customers, promote the sale of Lufkin products, and will perform all of the sales efforts in the local foreign country. It shall be the duty of said personnel to seek out any trade mark violations and, in general, keep up to date on economic and market conditions in the foreign country. Price Lufkin shall allow INTERNATIONAL deductions on its list price, which may vary from time to time by mutual agreement. In determining what prices shall be, Lufkin agrees to take into account the necessity of making the price competitive in the market in which the product is sold and to fairly compensate INTERNATIONAL for its promotional and sales efforts abroad. INTERNATIONAL agrees that [Lufkin] is to receive a fair and reasonable *244 profit for the manufacture of the products sold to INTERNATIONAL for resale abroad whever possible. Prices shall be determined as if the parties were unrelated and INTERNATIONAL shall receive no greater deductions from list prices than an independent third party performing identical services. [Lufkin] will keep INTERNATIONAL informed at all times of the prices at which it will sell products to INTERNATIONAL. Foreign Sales Commission [Lufkin] recognizes that in certain cases foreign customers of INTERNATIONAL, or customers who directly or indirectly result from sales or promotional efforts made by INTERNATIONAL, because of exemption from local customs duties or other reasons, will prefer to place orders directly with [Lufkin] and require that shipment be made directly to the customer. Thus it will not be possible for INTERNATIONAL to purchase and ship products in such cases in spite of all the sales and promotional activities performed by INTERNATIONAL outside of the United States. Therefore, [Lufkin] shall pay INTERNATIONAL as compensation for said foreign sales and promotional activities, a foreign sales commission which may vary from time to time, but in every case it *245 is agreed that INTERNATIONAL shall receive fair compensation for its foreign sales and promotional efforts and [Lufkin] shall receive a fair and reasonable manufacturer's profit. [Lufkin] will inform INTERNATIONAL in each and every case of the amount of foreign sales commission to be paid to INTERNATIONAL for its sales activities. Canadian Sales INTERNATIONAL agrees to supervise sales into Canada and work in conjunction with Lufkin Machine Co., Ltd., of Edmonton, Alberta, Canada INTERNATIONAL shall make its own arrangements as to prices to be paid by Lufkin Mechine Co., Ltd., for shipments by INTERNATIONAL on the basis of fairly compensating each for actual sales services rendered in Canada. INTERNATIONAL'S activities in Canada shall include visits by officers and directors, calling on customers, maintaining a stock of goods in Canada, whether it be with Lufkin Machine Co., Ltd. or some other entity, and in general all the necessary sales activity justified by the Canadian market for Lufkin products. INTERNATIONAL agrees that sales to Canadian customers as well as to Lufkin Machine Co., Ltd., will be on a delivered basis, that is, no arrival, no sale. Ownership, all property *246 rights 405 in, the legal title to, the right to control the shipment and risk of loss shall remain in INTERNATIONAL until the equipment is delivered in Canada. It is recognized by [Lufkin] and INTERNATIONAL that this method of shipment provides better service to the customers. Payment From time to time the parties shall make a calculation of the amounts INTERNATIONAL owes for products purchased from [Lufkin] and bill INTERNATIONAL. INTERNATIONAL agrees to pay said billings within a reasonable time thereafter. Foreign sales commissions due INTERNATIONAL shall be paid as promptly as convenient to the parties. Force Majeure [Lufkin] shall not be liable to INTERNATIONAL for any failure to deliver or delay in delivery of products hereunder due directly or indirectly to any of the following causes affecting [Lufkin] or its suppliers: strikes or other labor difficulties, fire, floods, failure of power, inability to operate or secure transportation or handling facilities, government regulations or any other conditions or circumstances reasonably beyond the control of [Lufkin] or its suppliers. During any period or periods of time when [Lufkin] is unable to make prompt *247 delivery hereunder, INTERNATIONAL shall be relieved of the obligation to sell. No Agency Nothing contained herein or done here under shall be construed as constituting either party the agent of the other in any sense of the word whatsoever. Duration This Agreement shall remain in full force and effect for ten (10) years from the date hereof; however, either party has the right to terminate the same at the end of one year from the date hereof or at the end of any consecutive year thereafter by giving written notice to the other party sixty (60) days in advance. Assignment This Agreement shall inure to the benefit of the successors and assigns of both of the parties hereto but may not be assigned by either party without the consent of the other party first had and obtained. The sales territory granted by Lufkin to Lufkin International under the Lufkin International Agreement included Canada so that the entire Western Hemisphere operations would be coordinated through one corporate vehicle. Moreover, it was felt that the initial arrangement between Lufkin and Lufkin Canada under the Lufkin Canada Agreement was inadequate. Immediately after the formation of Lufkin International, *248 L.A. Little, vice president of sales of Lufkin and president of Lufkin International, was placed on Lufkin International's payroll. The basic philosophy of Lufkin and Lufkin International in establishing a commission and discount arrangement under the Lufkin International Agreement was that both Lufkin and Lufkin International should be successful and prosperous in their respective manufacturing and selling operations. The language of the Lufkin International Agreement reflected this philosophy and the intent of the parties. The Agreement remained in effect during 1961 and 1962. During the years in question, Lufkin sold equipment to Lufkin International at list price less 20 percent, F.O.B. Lufkin, Texas, for resale to Lufkin Canada. Lufkin also paid Lufkin International a commission of 20 percent of the net invoice price for sales of Lufkin equipment in Venezuela. In establishing this arrangement, the parties attempted to set a pricing level which would yield Lufkin a satisfactory profit for its manufacturing operations and also would provide Lufkin International with adequate working capital and commissions because it was envisioned that Lufkin International might be required *249 to build additional warehouse facilities in Latin America and establish local foreign manufacturing operations. Also, the cost of operating in a high cost country, such as Venezuela, was another factor considered in establishing this pricing arrangement. Finally, the differences between the Canadian market and the market in the rest of the Western Hemisphere outside the United States with respect to the sale of Lufkin equipment made it necessary to consider a discount structure somewhat different from that arranged between Lufkin and Lufkin Canada. The Canadian market is geographically closer to the United States; it is basically English speaking; and it is a dollar economy. The salary and wage costs in Canada are generally lower than in more remote foreign countries. Moreover, Lufkin Canada provided its own counterweights for pumping units in Canada which enabled Lufkin Canada to accumulate foundry burden, applied overweight and freight and, by thus 406 reducing substantially the cost of the delivered unit in Canada it was able to earn a larger margin of profit on these sales than it would have if the entire unit was shipped from Lufkin, Texas. Additionally, the Canadian market *250 for Lufkin equipment was promoted and serviced without the utilization of agents. Immediately after Lufkin International was formed, the pricing arrangement established between Lufkin International and Lufkin Canada on all Lufkin equipment purchased by Lufkin Canada for Lufkin International for resale into Canada was list price less 10 percent, F.O.B. Lufkin, Texas. The third subsidiary corporation organized by Lufkin to engage in international business was Lufkin Overseas Corporation, S.A. (herein called Lufkin Overseas) which was formed on November 25, 1958. Lufkin Overseas is a Venezuelan corporation, wholly-owned by Lufkin. Prior to the organization of Lufkin Overseas, the oil business had expanded rapidly in the Near East. Lufkin intended to expand its export operations in the Near East and Lufkin management decided to organize a separate corporate vehicle which would ultimately operate in the Eastern Hemisphere in a similar manner as Lufkin International operated in the Western Hemisphere. Moreover, by 1958, A. V. Simonson, who theretofore had been charged with the responsibility of handling the sales of Lufkin equipment in the Eastern Hemisphere, was being phased out *251 as Lufkin's export agent because of failing health and had been placed on a salary as an employee of Lufkin. As was the case with Lufkin Canada and Lufkin International, Lufkin Overseas was formed as a separate corporate vehicle so that its operations could be conducted as an independent unit with its own management. Venezuela was selected as the country of incorporation for Lufkin Overseas because of the favorable tax situation. The fact that Lufkin International had existing operations and a qualified staff in Venezuela and had established a relationship with local attorneys and accountants were further considerations which prompted the selection of Venezuela as the country of incorporation. On November 28, 1958, Lufkin and Lufkin Overseas entered into an Agreement (herein called Lufkin Overseas Agreement) whereby Lufkin granted to Lufkin Overseas the nonexclusive right to sell Lufkin equipment in all countries of the world outside of the United States. The Lufkin Overseas Agreement remained in effect during 1961 and 1962. The Lufkin Overseas Agreement provided in part: Compensation LUFKIN shall compensate OVERSEAS for its foreign sales services and activities by means *252 of either a distributor's discount or a foreign sales commission. Price LUFKIN shall allow OVERSEAS deductions as a discount on its list prices which, because of the complex nature of the equipment which will be sold hereunder, the discount to OVERSEAS may vary from time to time. In setting the price for each product to OVERSEAS, LUFKIN agrees to take into account the necessity of making the price competitive in the market in which the product is sold and to fairly compensate OVERSEAS for its promotional and sales efforts abroad. OVERSEAS agrees that LUFKIN is to receive a fair and reasonable profit for the manufacture of the products sold to OVERSEAS for resale abroad. Foreign Sales Commission LUFKIN recognizes that in certain cases foreign customers of OVERSEAS, or customers who directly or indirectly result from sales or promotional efforts made by OVERSEAS, because of exemption from local customs duties or other reasons, will send orders directly to LUFKIN, and require that shipment be made directly to the customer. Thus it will not be possible for OVERSEAS to purchase and ship products in such cases in spite of all the sales and promotional activities performed by OVERSEAS *253 outside of the United States. Therefore, LUFKIN shall pay OVERSEAS as compensation for said foreign sales and promotional activities, a foreign sales commission, the amount of which may vary from time to time in accordance with the products sold and the parties will agree in each and every case of the amount of foreign sales commission to be paid to OVERSEAS for its foreign sales activities. Payment From time to time LUFKIN shall make a calculation of the amounts OVERSEAS owes for products purchased from LUFKIN and bill OVERSEAS. OVERSEAS agrees to pay said billings within a 407 reasonable time thereafter. Foreign sales commissions due OVERSEAS shall be paid as promptly as convenient to the parties. General Services It being recognized that the equipment manufactured and sold by LUFKIN is of a highly complex and technical nature requiring periodic care, it is hereby agreed that OVERSEAS will undertake to contact existing users of LUFKIN equipment to service the said equipment and to render all assistance possible in that connection. Such assistance and service shall include but not by way of limitation, the following: (1) Rendering of repairs and service on equipment *254 not functioning properly. (2) Rendering engineering service in connection with the use, or intended use, of LUFKIN products. (3) Advice and technical assistance with respect to proper use of equipment. (4) Investigation of claims by customers of breach of manufacturer's warranty. (5) Investigation of patent and trademark infringements occurring in foreign countries of the world. (6) Financing of sales of LUFKIN products wherever necessary or practical in foreign countries of the world. The basic objective of Lufkin and Lufkin Overseas under the Lufkin Overseas Agreement was to establish a commission and discount level which would yield a fair profit to Lufkin on its manufacturing operations and which would fairly compensate Lufkin Overseas for its promotional efforts. In actual practice, Lufkin Overseas did not take possession of, or title to, Lufkin's equipment during 1961 and 1962. Lufkin Overseas acted solely as Lufkin's foreign sales representative on a commission basis. During the years in question, Lufkin Overseas' sales and promotional efforts resulted in sales of Lufkin equipment in Argentina, Bolivia, Brazil, Colombia, Mexico and Peru. The commission level established *255 between Lufkin and Lufkin Overseas during 1961 and 1962 was 20 percent of the net invoice price. In establishing this commission level, consideration was given to the size of the geographical territory to be covered by Lufkin Overseas together with similar considerations that led to the 20 percent pricing arrangement established between Lufkin and Lufkin International such as the possibility of establishing local warehousing and manufacturing operations. Operations of Lufkin International, Lufkin Overseas and Lufkin Canada During 1961 and 1962 During 1961 and 1962, Lufkin Overseas was responsible for all areas of South America except Venezuela. During 1961 and 1962, Samuel T. Curtis was responsible for Lufkin Overseas' sales and service activities in the southern part of Latin America covering the countries of Argentina, Chile, Bolivia and partially Brazil. Roy Lilley, who was based in Maracaibo, Venezuela, managed the northern half of the Latin American operations of Lufkin Overseas. Mr. Curtis was graduated from Texas A & M University in 1956 and thereupon went directly to work for Lufkin at Lufkin, Texas. Initially Mr. Curtis participated in the sales training program of *256 Lufkin which is designed to orient sales engineers in the application and service of Lufkin equipment. The sales training program takes approximately 6 months and involves exposure to the various aspects of the manufacturing process. Upon completion of the training program a sales engineer trainee of Lufkin is transferred to the sales administration office of Lufkin where he is trained in quoting Lufkin equipment. In addition to being trained in quoting, a sales engineer must learn the proper application of Lufkin pumping units. Mr. Curtis spent approximately 18 months in the Lufkin sales administration office. During this period, Mr. Curtis also participated in the preparation of various freight rate studies and a petroleum production handbook. In February 1959, Mr. Curtis was sent to Dallas, Texas, for a short period to assist in the completion of a petroleum production handbook and thereafter was reassigned to Odessa, Texas, where he was trained in servicing Lufkin equipment in the field. This servicing aspect of Mr. Curtis' training program lasted for approximately six months. At that point Mr. Curtis became a qualified sales engineer for Lufkin. Thereafter in September of *257 1959, Mr. Curtis was placed in charge of the Odessa, Texas, sales district which involved the promotion and sale of Lufkin pumping units. In September 1960, Mr. Curtis was relocated to Buenos Aires, Argentina, as a sales engineer for Lufkin Overseas. He was primarily engaged in the promotion, sales and service of Lufkin equipment in the southern part of Latin America. This 408 involved working closely with the field engineers and field production managers of the major oil companies located in that territory. Each oil company had an entire strata of various oil field personnel and it was Mr. Curtis' responsibility to contact and, if possible, convince these people that Lufkin equipment was the most desirable for their wells. Mr. Curtis was also involved in training Lufkin Overseas' sales agents. In dealing with various oil field situations and advising a customer as to the selection of the proper oil field pumping unit, numerous considerations must be taken into account. In most cases, a sales engineer will know two variables: the depth of the well and the desired fluid production. These are the two principal variables involved in the selection of the proper unit. Other variables *258 involved in the selection of a pumping unit include: the gas-oil ratio (i.e., the percentage of gas in the oil) which affects the volumetric efficiency; the gravity or weight of the oil since a heavy oil containing, for example, asphalt might require a special air balanced pumping unit; the diameter of the well; the vertical direction of the well or whether the well is a slant hole well which, for instance, might require drilling from land out to sea; the location and climatic conditions of the well; the required maintenance of the well; and, of course, the customers' preference. An illustration of one commission transaction which Mr. Curtis was involved in was the sale of Lufkin pumping units to Pan American Argentina Oil Company (herein called Pan American) during 1961 and 1962. In this particular case, Pan American had become dissatisfied with the pumping units it was using because it was thought the system they were using should yield a higher volume of oil. Clark Fuller, production manager of Pan American, requested Mr. Curtis to analyze Pan American's oil field situation and prepare calculations as to what the Lufkin air balanced unit could produce at various depths. This analysis *259 involved preparation of several dozen production graphs by Mr. Curtis for Mr. Fuller and each graph entailed numerous calculations. Mr. Curtis met with Mr. Fuller on five or six different occasions and thereafter with other field personnel of Pan American in Comodoro Rivadavia, Argentina, who had to approve Mr. Fuller's recommendations. After this oil field analysis was completed and after Mr. Curtis furnished a quotation, Pan American ultimately purchased 74 Lufkin air balanced units. After these units were installed, Pan American's oil production increased threefold over what was previously produced with hydraulic pumps. An oil field analysis similar to that made for Pan American often can involve a period of up to 15 months. This may be complicated and prolonged because the customer does not know the relevant facts and conditions about the oil well. In the case of the Pan American order, the requisition for the 74 Lufkin air balanced units came from the field at Comodoro Rivadavia, Argentina, and was then approved at Buenos Aires, Argentina. The New York purchasing office of Standard Oil of Indiana, the parent company of Pan American, was then requested to place the order. Specifications *260 for that order were turned in by Mr. Fuller based on calculations made by Mr. Curtis. Mr. Curtis gave the field personnel of Pan American an approximate quotation and that was all that was necessary at the time. The New York office of Lufkin also played a role in the Pan American order. The New York purchasing office of Standard Oil of Indiana called the Lufkin New York office and requested a quotation on the specifications which their field personnel had submitted and the Lufkin New York office presented a quotation to Standard Oil of Indiana in New York. The New York office of Lufkin was aware that the requisition would be coming from Pan American in Argentina because of correspondence sent by Mr. Curtis from the field. The promotion of the Pan American order by Mr. Curtis was typical of his activities on behalf of Lufkin Overseas during 1961 and 1962, in that such order involved preparing calculations and production graphs for the customer indicating what a particular Lufkin unit could produce, convincing the customer that Lufkin equipment was the best they could purchase, and followup activities subsequent to the order. During the years in question it was common for major *261 oil companies such as Standard Oil of Indiana and Esso International to utilize purchasing offices in New York City. These central purchasing offices allowed the oil companies to 409 purchase for all their worldwide subsidiary companies and to obtain better prices on certain products which were purchased through competitive bidding. Moreover, these central purchasing offices were able to negotiate more favorable freight rates. With regard to pumping unit purchases, these central purchasing offices essentially assisted in processing the order, preparing the necessary papers, and coordinating shipments. The requisition for specific pumping units would come from a subsidiary or branch of the oil company in Latin America which was generally an autonomous operation with its own board of directors and budget. On engineered type products, such as Lufkin units, the decision as to whether a particular unit should be purchased was made by the subsidiary or branch operation in Latin America although the New York purchasing office could obtain competitive bids and request the field to reconsider their request. In promoting the sale of Lufkin equipment in Latin America, the amount of time *262 involved to generate an order varies considerably. In the Pan American situation, the order was received rather quickly but in other instances Lufkin Overseas' sales engineers have promoted customers for a period of 10 years without procuring an order. Very recently Lufkin Overseas received an order in Argentina for which promotional efforts began in 1960. Only about 30 percent of the customers called on by sales engineers of Lufkin Overseas ultimately purchase Lufkin equipment. During the period covering November 20, 1961 to December 28, 1961, Mr. Curtis made 41 calls on 18 different customers. These personal calls all took place in Argentina with the exception of one customer who was located in La Paz, Bolivia. The number of personal calls made by Mr. Curtis during the period January 1, 1961, and November 20, 1961, was unavailable. During 1962, Mr. Curtis made a total number of 406 personal calls on 35 different customers. These customers were principally located in Argentina but Mr. Curtis made two calls on a customer in Chile. During the years in question, Lufkin Overseas utilized agents in Argentina, Bolivia, Brazil, Mexico and Peru. The following agents were employed by Lufkin *263 Overseas in the countries listed opposite their names. Agent
Country
Matpetrol
Argentina
Gene L. Towle
Mexico
John Herasimchuk
Peru
Alberto Vasquez
Bolivia
Macquip Servicos de Engenhariae Equipmentos, S.A.
Brazil These agents were compensated by a commission of from 2 1/2 percent to 5 percent on all sales of Lufkin equipment in their territory regardless of whether the agent participated in the sale. Additionally a retainer fee of $100 to $200 per month was paid to most of these agents. With the exception of John Herasimchuk and Gene L. Towle, none of Lufkin Overseas' agents were previously employed by Lufkin or Lufkin International. In 1958 prior to the organization of Lufkin Overseas, these two agents were paid a monthly retainer fee by Lufkin International but no commissions were ever paid to either by Lufkin International because no sales were made in their respective territories. The agents of Lufkin Overseas were hired for the purpose of providing immediate on-the-spot contact with the customers of Lufkin Overseas should such a need arise. The customer could, for example, call upon an agent and the agent would then contact a sales engineer of Lufkin *264 Overseas and relate the customer's problem to the sales engineer. Lufkin Overseas' agents handled other accounts and often represented as many as 20 different accounts. Lufkin Overseas' agents were familiar in a general manner with the type of equipment manufactured by Lufkin. However, they were unfamiliar with the basic application of a pumping unit and were unable to apply these units to the customer's requirements. Lufkin Overseas' agents were not furnished price books and would not make quotations on Lufkin equipment. Lufkin Overseas' agents generally did not service Lufkin equipment because more often than not the customer was more familiar with the equipment than the agent. When a service problem arose the agent's responsibility was normally to contact a sales engineer of Lufkin Overseas and apprise him of the servicing problem. During the years in question, the sales engineers of Lufkin Overseas were required to service Lufkin equipment in the fields. The service problems encountered by sales engineers of Lufkin Overseas were atypical and rarely involved a problem similar to any encountered before. One such instance was with Chevron Oil in Venezuela where one of its air *265 balanced units 410 developed a leak and repair assistance was requested. This was a situation where a sales engineer was unable to make the necessary repairs and recommended that the equipment be taken to a machine shop for repair. A sales engineer located a welding company and outlined to that company the proper manner in which to make the repair. No charge was made for this assistance. Due to the large and complicated nature of Lufkin equipment, Lufkin Overseas was unable to provide a full repair service. On occasion, therefore, sales engineers were required to contact foundries and machine shops to assist customers in repairing Lufkin pumping units. This assistance was of a supervisory nature. In some instances the work of the foundries and machine shops would be guaranteed by Lufkin Overseas. Moreover, Lufkin Overseas made no charge to its customers for service and repair work during the years in question. Lufkin provides a one-year warranty on all its pumping units sold in Latin America and in some cases, although not legally obligated, Lufkin Overseas extends the warranty beyond a one-year period because a customer expects the equipment to last for 20-25 years. In some *266 instances it is also necessary to furnish spare parts to a customer at no cost and for Lufkin Overseas to absorb the freight charge from the United States on such parts. Lufkin Overseas in some instances also must bear the cost of disassembly and reassembly of Lufkin equipment where it is felt that the breakdown of the equipment was the fault of Lufkin Overseas. The timing of service is of great importance to Lufkin Overseas customers since a given oil well may have the capacity to produce thousands of barrels of oil a day and even a short breakdown in production would be extremely costly to the customer. Lufkin oil field pumping units are usually operated 24 hours per day. During the years in question, sales engineers of Lufkin Overseas assisted in the installation of Lufkin pumping units. Installation of a pumping unit generally involves the mounting of the unit on a concrete slab which has to meet certain specifications. Lufkin sends out drawings with complete specifications to the contractor who makes the concrete foundation. A Lufkin Overseas sales engineer then supervises the contractor's activities to make sure that the specifications are followed. Once the concrete base *267 is poured, the pumping unit, which is shipped disassembled, must be assembled and installed. The contractor is advised by the sales engineer for Lufkin Overseas as to the method of assembly, the alignment and the complete installation of the unit. At the same time the sales engineer must advise the customer as to the proper maintenance and repair of the unit. Normally a sales engineer will return to the field 30 days after a unit is installed to inspect the operation. Installation and assembly of one Lufkin pumping unit can take anywhere from three hours on a small unit to as much as three days on larger units. Orders consisting of a number of pumping units could involve substantial time for installation and assembly. Sales engineers of Lufkin Overseas attempted to supervise the installation and assembly of all Lufkin units. After the pumping unit has been assembled and installed, Lufkin Overseas' sales engineers provide full instructions on the operation of the pumping unit to the customer and the mechanical operating procedure which should be followed to make sure that the unit will perform satisfactorily. This includes instructions on counterbalancing since counterbalancing *268 is a key aspect of the unit. During the years in question, Mr. Curtis occupied office space with Lufkin Overseas' Argentine agent Marpetrol, in Buenos Aires, Argentina, where in addition to the sales and service activities performed in 1961 and 1962, he investigated and studied the possibility of establishing local manufacturing operations in Argentina. This investigation resulted from heavy manufacturing competition in Argentina from SIAM-DI-TELA. This particular investigation involved from 30 to 60 days. No compensation was received by Mr. Curtis or Lufkin Overseas for these efforts. During the years in question, Lufkin Overseas also participated in the 150th anniversary of Argentina's independence by purchasing two pumping units from Lufkin and placing them on exhibit in Buenos Aires, Argentina. Lufkin Overseas purchased the units, had them shipped to Argentina, paid for the importation, negotiated with the exposition officials with regard to the exhibit, and eventually disposed of the units. Lufkin Overseas' agent Matpetrol, assisted in arranging for the exhibit but Lufkin Overseas bore most of the expenses 411 involved. The exhibit lasted for approximately six months. *269 During 1961 and 1962, Lufkin International maintained an office in Maracaibo, Venezuela, and Roy Lilley, a qualified sales engineer, was resident manager of that office. During this period Lufkin International also maintained an office in Anaco, Venezuela, and employed two qualified sales engineers, Jack Jumper and W. A. Champion. In the middle of 1962, Roy Lilley was transferred from Maracaibo, Venezuela, to Canada and placed in charge of Lufkin Canada's operations. Also at that time Jack Jumper was relocated from Anaco, Venezuela, to Maracaibo, Venezuela, and W. A. Champion was transferred back to the United States as a sales engineer in Odessa, Texas. Roy Lilley was graduated from Texas A & M University as a petroleum engineer and went to work for Lufkin in 1952. Mr. Lilley participated in the Lufkin training program that all sales engineers must experience. After completion of this training program, Mr. Lilley was transferred to Sydney, Montana, where for five years he was the operating manager of that office prior to his transfer to Anaco, Venezuela, in 1958. Jack Jumper was graduated from Texas A & M University and went to work for Lufkin in 1956. Mr. Jumper likewise participated *270 in the complete sales training program of Lufkin and later worked in the Houston and Corpus Christi areas in the selling and servicing of Lufkin equipment as a sales engineer. Mr. Jumper relocated to Anaco, Venezuela, in 1958. W. A. Champion was graduated from Texas A & M University and likewise participated in the Lufkin training program for sales engineers. Mr. Champion was then transferred to Odessa, Texas, where he worked as a serviceman and in several other locations in the United States before relocating in Anaco, Venezuela, in 1960. During the years in question, Jack Jumper and W. A. Champion were sales engineers of Lufkin International in the Anaco, Venezuela, office. They both operated out of the Anaco office which also had a warehousing facility. During this period these sales engineers, apart from promoting, selling and servicing Lufkin equipment, carried out turnkey installations of pumping equipment in the Anaco area. This essentially involved purchasing new or used equipment from one well site and transporting it to another oil field and installing it at the new location. During the years in question, the Maracaibo, Venezuela, office was the home office for both *271 Lufkin International and Lufkin Overseas. The Maracaibo office also had warehouse facilities. Roy Lilley was the manager of that office and employed a warehouseman who also served as a part-time serviceman, and a secretary. In addition to serving as resident manager of Lufkin International in Maracaibo, Mr. Lilley was the Latin American sales manager for Lufkin Overseas and traveled outside of Venezuela in the northern half of Latin America on behalf of Lufkin Overseas. During the years in question, the sales engineers located in Venezuela regularly promoted the sale of Lufkin equipment both within and without Venezuela. The selling, servicing, repair and installation activities performed by Lufkin International's sales engineers during the years in question were essentially equivalent to those performed by Mr. Curtis on behalf of Lufkin Overseas. During 1961, Roy Lilley made 418 personal calls on 25 different customers. These personal calls included 14 visits to customers in Colombia. During 1962, Mr. Lilley made 189 personal calls on 25 different customers which included 4 personal visits to customers in Colombia. During 1961, Jack Jumper made 456 personal calls on 37 different *272 customers which included 8 calls to customers located in Trinidad and 11 calls on customers located in Colombia. During 1962, Mr. Jumper made 541 personal calls to 32 different customers which included 17 visits to customers in Brazil and 10 visits to customers in Colombia. During 1961, W. A. Champion made 366 personal calls on 24 different customers. Included in these visits were 14 calls on customers located in Colombia. No information was available with regard to Mr. Champion's activities during 1962. Exposure to Financial and Other Risks During the years in question, Lufkin Overseas extended credit in the form of a note receivable to Loeb Rhodes Development Company in Argentina. This credit was extended to Loeb Rhodes over a period of several years to enable it to purchase Lufkin pumping units. As of January 1, 1961, the outstanding note receivable from Loeb Rhodes for this equipment was $486,144. Loeb Rhodes had made an extremely attractive contract with the Argentine Government to develop the oil fields in Mendoza and needed financial backing. 412 During the years in question, Lufkin Overseas and Lufkin International were exposed to risks of expropriation in the *273 countries in which they were operating. Loeb Rhodes Development Company was one of several examples of potential risks of expropriation. The risk of expropriation was real as indicated by the fact that in 1963 the Argentine Government took over most United States and foreign investments in the oil business in Argentina. Manufacturing Operations During the years in question, both Lufkin International and Lufkin Overseas' sales engineers made investigations into the possibility of locally manufacturing Lufkin equipment. Such investigations were made in Brazil and other countries in Latin America where Lufkin Overseas and Lufkin International had potential customers. Language Facility A knowledge of Spanish was required by all sales engineers of Lufkin International and Lufkin Overseas to properly fulfill their functions in the Spanish speaking Latin American countries during these years. Messrs. Curtis, Champion, Jumper and Lilley all spoke Spanish adequately to perform as sales engineers. Mr. Curtis took lessons from both a private tutor as well as the Berlitz School in Buenos Aires, Argentina. The lack of knowledge of Portuguese by a sales engineer of Lufkin Overseas has *274 been very detrimental in terms of promoting Lufkin equipment in Brazil. Lufkin Canada During 1961 and 1962, Lufkin Canada acted as a distributor for Gaso Pump & Burner Manufacturing Company (herein referred to as Gaso) of Tulsa, Oklahoma, in Western Canada. Lufkin Canada acted as Gaso's distributor for duplex and triplex pumps which are designed for and used to transport oil through a pipeline. These products are not complementary to or used in any way with Lufkin equipment and during 1961 and 1962, sales of Gaso products accounted for approximately 5 to 10 percent of Lufkin Canada's total business. Lufkin Canada warehoused Gaso products and parts on a consignment basis. In the event of a sale, Lufkin Canada would pay Gaso for the equipment sold and would reorder the unit or part from Gaso to refill its inventory. During the years in question, sales engineers of Lufkin Canada were rarely called upon to service Gaso products because the customers that use Gaso products had qualified men within their own organization to service them. Moreover, Lufkin Canada's sales engineers had limited training with regard to the construction and use of Gaso pumps. Even Mr. Jack Gissler, who *275 was resident manager of Lufkin Canada during 1961 and 1962, only went through a two-day training session at Tulsa, Oklahoma, prior to being transferred to Canada in 1954. Neither were sales engineers of Lufkin Canada generally required to supervise the installation of Gaso pumps during this period since these products were usually shipped in a completely assembled fashion from the United States to Canada. Also, both the sales and service personnel of Gaso were available to Lufkin Canada and could come to Canada upon the request of Lufkin Canada during this period. However, Lufkin Canada did not have occasion to use any of Gaso's service personnel. During 1961 and 1962, the handling of Gaso products by Lufkin Canada did not require the addition of any personnel to the staff of Lufkin Canada not did it require an increase in office space. Gaso products were advertised in several magazines in Canada and the cost of such advertising was borne exclusively by Gaso. During the years in question, Lufkin Canada purchased Gaso pumps at list price less 10 percent and Gaso parts at list price less 25 percent. Lufkin Canada resold such pumps and parts at list price. Operations of Lufkin's *276 New York Office During 1961 and 1962, Lufkin maintained a branch office in New York City. A V. Simonson was manager of the New York office and export manager of Lufkin. Mr. Simonson's health was failing and he was active approximately 50 percent of the time. A. R. Beaulieu was in charge of marine and industrial gear sales for the eastern part of the United States. Robert B. Gibbs was assistant to Mr. Simonson and spent approximately 50 percent of his time working with Mr. Simonson. The remainder of Mr. Gibbs' time was spent working with Mr. Beaulieu on domestic gear sales. The New York office also had three secretaries during 1961 and 1962. During 1961 and 1962, the New York office of Lufkin had three basic areas of responsibility; (1) domestic marine and 413 industrial gear sales; (2) exports to the Eastern Hemisphere; and (3) exports to the Western Hemisphere. During 1961 and 1962, neither Lufkin International nor Lufkin Overseas had sales engineers located in the Eastern Hemisphere. Eastern Hemisphere sales were the sole responsibility of the domestic offices of Lufkin including the New York office. The New York office received direct inquiries from customers in the Eastern *277 Hemisphere and the office would prepare quotations for the customer and in a general manner attempt to procure the order. During 1962, a typical order received from the Eastern Hemisphere was from Turkish Petroleum Company, the governmentoil company in Turkey. Turkish Petroleum had previously acquired equipment as a result of promotional activities of Vic Fawcett of the Lufkin Los Angeles office who had made a trip to Turkey in 1957 to promote Lufkin equipment. During 1961 and 1962, the New York office received further inquiries from Turkish Petroleum Company, made recommendations for a specific oil field pumping unit, prepared quotations, and gave the customer recommendations on prime movers. An order from Turkish Petroleum Company was ultimately received. With regard to export transactions in the Western Hemisphere during 1961 and 1962, the New York office of Lufkin acted principally as a liason between Lufkin International and Lufkin Overseas and the New York purchasing offices of the major oil companies. The Lufkin New York office would receive an inquiry from the New York purchasing office of the oil company or directly from the field which inquiry almost without exception would *278 specify a particular model of Lufkin equipment. The New York office of Lufkin would thereupon quote a price for the unit for the purchasing office, receive the order from the customer, transmit the order to the home office at Lufkin, Texas, for manufacture, coordinate delivery dates, and provide the customer with shipping information. The customer would normally effect the shipment of the units to Latin America. During 1961 and 1962, no personnel of the New York office of Lufkin traveled outside the United States. Non-Commission Transactions During 1961 and 1962, Lufkin made sales of its equipment outside the United States in both the Eastern and Western Hemisphere in amounts of $55,170.16 and $339,486.17 on which no sales commissions were paid to either Lufkin International or Lufkin Overseas. With regard to these non-commissioned sales in the Eastern Hemisphere, no commissions were paid to either Lufkin International or Lufkin Overseas because neither company promoted the equipment of Lufkin in the Eastern Hemisphere and neither company had sales engineers located in that hemisphere during those years. These Eastern Hemisphere non-commissioned sales were generated by promotional *279 efforts of various Lufkin sales engineers based in the United States. For example, in 1957 Vic Fawcett of the Lufkin Los Angeles office traveled to Turkey to promote Lufkin equipment. In 1959, Tom Crowder, a Lufkin sales engineer from Eastern Texas, traveled to Libya, Lebanon and Turkey on a sales promotion trip for Lufkin. In 1961, W. H. Miner, division manager of Lufkin Gulf Coast Division, visited the Middle East on a sales promotion trip. With regard to sales of Lufkin equipment in the Western Hemisphere upon which no commissions were paid to either Lufkin International or Lufkin Overseas, the billing department in Lufkin, Texas, normally made a determination as to whether or not sales commissions should be paid. The billing department would review field correspondence of the sales engineers in Latin America to determine whether any promotional activities had been carried on by sales engineers or agents of Lufkin International or Lufkin Overseas. Based on a review of the correspondence from the field, the billing department would determine whether or not a commission was to be paid. In questionable cases, the billing department would consult either, or both, the sales office *280 at Lufkin, Texas, and the New York office. During 1961 and 1962, it was not a standard practice for major oil companies to send out invitations to bid to manufacturers of oil field equipment. There were, however, exceptions in the case of government oil companies where by law or policy such companies would have to tender an invitation to bid to various manufacturers. This was not, however, the general practice of the major oil companies who were customers of Lufkin. General Promotional Activities During 1961 and 1962, the New York office of Lufkin performed general promotional 414 activities with regard to the oil industry. Generally these promotional activities were designed to promote Lufkin products and the Lufkin name with all the oil companies and anyone in the oil business. For example, Mr. Gibbs and Mr. Simonson would call on executives in the engineering, purchasing and production departments of major oil companies located in New York who were concerned in a general way with oil production. However, these promotional visits never involved the use or application of any particular unit in the field. The calls were designed simply to acquaint individuals with the general *281 nature of the equipment sold by Lufkin. These promotional activities were not directed specifically to export sales but related to the promotion of Lufkin products anywhere in the world including the United States. The New York office of Lufkin played no role in Canadian sales of Lufkin equipment. Accounting and Financial Data Allocation of Salaries of Sales Engineers During 1961 and 1962, William A. Kirkland, secretary of Lufkin, had general supervision of the accounting, credit and collection and billing departments. Mr. Kirkland was also treasurer of Lufkin Overseas during 1961 and 1962 and in such capacity supervised the accounting functions and credit and collection policies of that company. During 1961 and 1962, Lufkin International and Lufkin Overseas had sales engineers located in Maracaibo, Venezuela (Roy Lilley), Anaco, Venezuela (Jack Jumper and W. A. Champion), and Buenos Aires, Argentina (Samuel T. Curtis). The interim salary payments of these sales engineers were paid during the course of the year by Lufkin. This was done as a matter of accounting convenience and in order to enable these men to maintain their social security and pension rights in the United States. *282 At the end of each year, the aggregate salary expense of these sales engineers was charged to Lufkin Overseas and Lufkin International based on the estimated amount of time which each individual spent working for Lufkin International and Lufkin Overseas. For 1961 and 1962, the salary of Roy Lilley, manager of the Maracaibo office, was allocated 50 percent to Lufkin International and 50 percent to Lufkin Overseas. The salaries of W. A. Champion and Jack Jumper were both allocated 100 percent to Lufkin International during both these years. The salary of Samuel T. Curtis was allocated 100 percent to Lufkin Overseas during both these years. Administrative Charge by Lufkin During 1961 and 1962 the following administrative expenses of Lufkin were charged to Lufkin International and paid by Lufkin International to Lufkin: 1961
1962
Officers' salaries
$3,600
$3,600
Office salaries
4,100
4,100
Office expense
1,450
1,450
Audit
100
100
Miscellaneous
250
250
$9,500
$9,500
The allocation of officers' salaries for each year was de The allocation of officers' salaries for each year was determined from an estimate of the amount of time spent by officers *283 of Lufkin working on business of Lufkin International. Of the $3,600, $3,000 represented the salary of L. A. Little, vice president of sales for Lufkin and president of Lufkin International, and $600 represented the salary of H. L. Dyer, secretary of Lufkin International. The charge for Mr. Little represented approximately 10 percent of his total salary for each year. This salary charge for Mr. Little included time spent in traveling outside the United States, including trips to Canada of approximately one week's duration during both 1961 and 1962. The charge of $4,100 each year for office salaries was an estimate of the amount of time involved by office personnel of Lufkin in Lufkin, Texas, in the billing and accounting departments and included office time of personnel typing invoices and other administrative expenses on sales of Lufkin International to Lufkin Canada. None of the administrative expenses charged by Lufkin to Lufkin International during 1961 and 1962 related to expenses of the New York office of Lufkin. During 1961 and 1962, Lufkin charged Lufkin Overseas administrative expenses in an amount of $15,000 for each year. These charges were paid by Lufkin Overseas to *284 Lufkin at yearend. These expenses included items such as officers' salaries and office salaries and included travel of the president of Lufkin Overseas, L. A. Little, outside the United States. These charges included administrative expenses incurred by the New York office of Lufkin. 415 Comparison of Domestic and Export Sales There are several significant differences between domestic and export sales of Lufkin pumping units. Customers in foreign markets tend to purchase larger size pumping units than those purchased by their domestic counterparts, principally because foreign customers have no government restrictions on production. This traditionally has enabled Lufkin to earn a higher profit on export sales because Lufkin's manufacturing facilities are geared to produce larger units more efficiently and economically. Additionally, in terms of inventory requirements, export orders generally have a much larger lead time for manufacturing and, therefore, can usually be scheduled to fit into the production schedule in a more efficient, economical fashion than domestic orders. During 1961 and 1962, Lufkin maintained a substantial inventory in the United States consisting principally *285 of component parts because domestic customers almost invariably required immediate delivery. Lufkin International Canadian Sales During 1961 and 1962, Lufkin International acquired oil field pumping units and spare and replacement parts from Lufkin for resale to Lufkin Canada. All right, title and interest in such equipment passed from Lufkin to Lufkin International at Lufkin's plant in Lufkin, Texas. This equipment was either consigned to a common carrier for shipment to Canada or shipped on Lufkin trucks to Canada. Lufkin International retained title to all equipment purchased from Lufkin from the time of departure at Lufkin, Texas, until such equipment arrived at the port of entry in Canada. The equipment was either shipped directly from Lufkin, Texas, to the ultimate customer in Canada or to Lufkin Canada at Edmonton. Normally, sales by Lufkin to Lufkin International for resale to Lufkin Canada during 1961 and 1962 originated in the following manner. Employees of Lufkin Canada would call on customers, would solicit and obtain orders for Lufkin equipment or would determine that additional Lufkin equipment was needed for warehouse stock in Canada. After determining that additional *286 warehouse stock was needed, or on obtaining an order from a customer which required delivery from the factory, Lufkin Canada would make out a purchase order and would mail it to the office in Lufkin, Texas. The order would be addressed to the factory in the name of Lufkin International which was the seller under the distributorship agreement between Lufkin International and Lufkin Canada. The purchase order was directed to the attention of G. L. Vickrey, Manager of Lufkin's order department in Lufkin, Texas, or another employee of Lufkin who would immediately cause the order to be filled either through warehouse stock or through commencement of manufacturing operation and would, when the order was ready, simultaneously type two invoices. The first invoice would show the sales price from Lufkin to Lufkin International at list price less 20 percent, less a 2 percent cash discount if paid within 10 days. The second invoice prepared simultaneously by employees of Lufkin reflected the sale to Lufkin Canada, showing the sales price at list, less 10 percent, with terms of net within 30 days. Lufkin would then crate the equipment and either ship it or cause it to be shipped to Lufkin Canada *287 or direct to Lufkin Canada's customer. The merchandise was shipped either on Lufkin's own trucks or by common carrier. Lufkin did at least part of its own trucking. The invoices of goods for entry into Canada show Lufkin Limited as purchaser and shipment from Lufkin, Texas. The invoice reflects the selling price to the purchaser in Canada and the fair market value at time and place of shipment in currency of the country of export as the price at which the goods were sold to Lufkin Canada less 10 percent. On receipt of the invoice, Lufkin Canada would mail a check covering the invoice to Lufkin. On receipt of the check Lufkin would draw up a check on Lufkin International's account, payable to Lufkin for the equipment or for the product sold. During 1961 and 1962, all accounting and paperwork of Lufkin International with regard to sales of Lufkin equipment to Lufkin Canada was performed in Lufkin, Texas, by Lufkin employees. At yearend Lufkin International was charged by Lufkin for performing such accounting and other paperwork. This charge was based upon an estimate of the expenses incurred by Lufkin in handling the affairs of Lufkin International and was made by William A. Kirkland, *288 secretary of Lufkin. No employees of International in Venezuela played any part in regard to any Canadian transaction. During 1959, 1960, 1961 and 1962, all income of Lufkin International from the sale of equipment which it purchased from Lufkin was derived from the sale of such equipment outside the United States. In 416 this connection, Lufkin International maintained bank accounts in Maracaibo and Anaco, Venezuela, and Lufkin, Texas. Lufkin Accounting System During 1961 and 1962, Lufkin employed an internal accounting system which resulted in a profit breakdown by three divisions: the machinery division, the mill supply division and the trailer division. In determining manufacturing costs for each division, Lufkin employed a job order cost system whereby each order going through the manufacturing plant was charged with various costs attributable thereto, such as labor and parts. Under this system, the specific manufacturing cost for each order was determined. The job order cost sheets for orders completed during 1961 and 1962 were filed permanently in the order department after the accounting department had computed the cost of the order. The original job order cost *289 sheets for 1961 and 1962 were inadvertently destroyed when the order department moved its location. A substantial number of photocopies of the original job order cost sheets for 1961 and 1962 are, however, available. During the course of the audit for these years, Lufkin computed the costs on a number of orders for the Internal Revenue Service agent and copies of the job order cost sheets were reproduced and retained by the accounting department at Lufkin. These job order cost sheets were made available to the Internal Revenue Service during the course of the audit and also to Arthur Andersen & Co., just prior to the trial of this case. Breakdown of Income of Lufkin International and Lufkin Overseas Lufkin International During 1959, 1960, 1961 and 1962, three major types of income were earned by Lufkin International: (a) Commission income received by Lufkin International from Lufkin. (b) Income from sales of new Lufkin equipment. (c) Income from sales to unrelated parties in Venezuela of used oil pumping units. The gross sales of Lufkin and the gross commission income earned by Lufkin International on sales of Lufkin's equipment in Venezuela for 1959, 1960, 1961 and 1962 *290 were as follows: Gross Commission
Year Ended
Gross Sales
Income of
December 31
by Lufkin
Lufkin International
1959
$597,045.35
$119,409.07
1960
783,026.60
156,605.32
1961
352,097.68
70,419.52
1962
345,530.95
69,106.21
During 1959, 1960, 1961 and 1962, Lufkin priced all equipment to Lufkin International on purchases for resale at list price less 20 percent, F.O.B., Lufkin, Texas. Lufkin International's sales of Lufkin equipment were of two types: (a) Sales to Lufkin Canada, and (b) Sales to unrelated Venezuelan customers from inventory warehoused in Lufkin International's two Venezuelan warehouses. The sales, cost of sales, and gross profit of Lufkin International on all sales of Lufkin equipment during 1959, 1960, 1961 and 1962 were as follows: Year Ended
Gross Profit
December 31
Gross Sales
Cost of Sales
on Sales
1959
$ 707,396.94
$ 622,436.04
$ 84,960.90
1960
557,599.98
491,424.43
66,175.55
1961
506,680.47
423,909.71
82,770.76
1962
1,298,345.00
1,134,892.00
163,453.00
In addition to the sales of Lufkin equipment, during 1962 Lufkin International purchased used pumping units from unrelated *291 parties in Venezuela, rebuilt and repaired such units and resold them to unrelated parties in Venezuela. The sales (which include certain installation charges), cost of sales and gross profit of Lufkin International during 1962 on such activities were as follows: Sales
$236,870.86
Cost of sales
185,127.41
Gross Profit
51,743.45
The sales, cost of sales, and gross profit of Lufkin International for 1959, 1960, 1961 417 and 1962 solely on sales of Lufkin equipment to Lufkin Canada were as follows: Year Ended
Canadian
Gross Profit on
December 31
Gross Sales
Cost of Sales
Canadian Sales
1959
$ 640,163.18
$ 568,159.63
$ 72,003.55
1960
511,843.99
453,930.39
57,913.60
1961
444,281.21
394,928.36
49,352.85
1962
1,234,771.19
1,098,770.30
136,000.89
The sales, cost of sales, and gross profit of Lufkin International for 1959, 1960, 1961 and 1962 solely on the sale of spare and replacement parts to unrelated customers in Venezuela were as follows: Year Ended
Venezuelan
Cost of
Gross Profit on
December 31
Gross Sales
Sales
Venezuelan Sales
1959
$67,233.76
$54,276.41
$12,957.35
1960
45,755.99
37,494.04
8,261.95
1961
62,399.26
28,981.35
33,417.91
1962
* 63,573.81
* 36,121.70
* 27,452.11
*292 Lufkin International's other income (excluding the items set forth above) for 1959, 1960, 1961 and 1962 was as follows: Other Income [*]
1959
1960
1961
1962
Gain (or loss) from sale of
$3,062.68
($ 294.75)
$ 431.65
$ 846.09
capital assets
Rent
2,300.00
3,200.00
3,900.00
2,055.39
Interest
163.57
227.74
Gain on exchange rate
2,944.29
1,608.11
Total
$5,362.68
$3,068.82
$7,275.94
$4,737.33
[*] Excludes United States income tax refund not includable in income.
The rent income described in the preceding paragraph was derived from the rental of real property located in Venezuela. The gain (or loss) from the sale of capital assets described above was derived from the purchase and resale of personal property in Venezuela. For 1959, 1960, 1961 and 1962, Lufkin International's total gross income from all sources was as follows: Year Ended
December 31
Gross Income
1959
* $209,732.65
1960
* 225,849.69
1961
160,466.22
1962
* 289,039.99
For 1959, 1960, 1961 *293 and 1962, the total sales and commission income of Lufkin International (excluding "other income" set forth above), as a percent of the total gross income of Lufkin International, was as follows: Year Ended
Percent of Total
December 31
Gross Income
1959
97.4
1960
98.6
1961
95.5
1962
98.4
For 1959, 1960, 1961 and 1962, the gross income of Lufkin International described above, together with the other Venezuelan source income from (a) interest, and (b) gain on exchange rate described above, as a percent of Lufkin International's total gross income, was as follows: Year Ended
Percent of Total
December 31
Gross Income
1959
100.0
1960
99.9
1961
98.2
1962
99.4
During 1961 and 1962, Lufkin International maintained warehouses in Maracaibo, Venezuela, and Anaco, Venezuela, which contained an inventory of spare and replacement parts manufactured by Lufkin. The combined inventory of these two 418 warehouses was $118,969.50 on December 31, 1961, and $117,080.08 on December 31, 1962. Lufkin International's profit and loss statement for the year ending December 31, 1961, contained the following: SALES
$510,222.43
Less Sales Return and Allowances
3,541.96
$506,680.47
COST OF SALES
Merchandise Purchased for Resale
$435,763.55
Less Purchase Returns & Allow.
1,522.96
434,240.59
Inventory 12-31-60
105,563.76
Shipping Expense
3,074.86
542,879.21
Less Inventory
118,969.50
$423,909.71
GROSS INCOME
$ 82,770.76
OTHER INCOME
Commissions
$ 70,419.52
Rent Income
3,900.00
Other Income
2,944.29
$ 77,263.81
Plus Gain from Sale of Capital Assets
431.65
$ 77,695.46
TOTAL INCOME
$160,466.22
EXPENSES
Auditing Expense
$ 100.00
Building Repair & Maintenance
987.93
Depreciation Expense
5,802.16
Gain or Loss on Exchange Rate
.40
Insurance Expense
349.66
Janitorial & Yard Expense
206.90
Legal Expense
1,801.80
Office Expenses
3,356.62
Office Salaries
9,614.28
Officers Salaries
3,600.00
Pension Expense
1,034.00
Rent Expenses
1,234.99
Salaries Warehouse
1,702.59
Salesmen's Salaries
36,262.50
Social Security Tax Expenses
804.99
Social Security Tax-- Venezuela
$ 184.61
Taxes
754.66
Travel Expense
18,371.07
Utilities
653.71
Miscellaneous Expense
1,755.62
$ 88,578.49
INCOME BEFORE TAXES
$ 71,887.73
LESS INCOME TAX
* -21,817.37
NET INCOME AFTER TAXES
$ 50,070.36
*294 419 Lufkin International's balance sheet as of December 31, 1961, contained the following: ASSETS
12-31-61
12-31-60
CURRENT
Cash in Banks
$ 47,484.62
$ 5,641.59
Accounts Receivable
95,336.72
27,403.99
Inventory
118,969.50
105,563.76
$261,790.84
$138,609.34
FIXED
Land
37,329.36
37,329.36
Buildings
$ 99,146.59
Fence
885.89
Tools & Equipment
255.39
Furniture & Fixtures
9,211.20
Automobiles
9,436.95
$118,936.02
Less Reserve for Depr.
14,764.72
$104,171.30
$104,116.89
$141,500.66
$141,446.25
TOTAL ASSETS
$403,291.50
$280,055.59
LIABILITIES AND CAPITAL
CURRENT
Accounts Payable
$ 85,459.89
$ 8,931.35
Reserve for Income Tax
12,305.25
14,842.38
97,765.14
Accrued Taxes
(716.13)
109.73
$ 97,049.01
$ 23,883.46
CAPITAL
Capital Stock
$ 10,000.00
$ 10,000.00
Surplus
296,242.49
246,172.13
$306,242.49
$256,172.13
TOTAL LIABILITIES
AND CAPITAL
$403,291.50
$280,055.59
SURPLUS ANALYSIS - YEAR 1961
BALANCE
January 1, 1961
$246,172.13
ADD:
Income for 1961
$ 71,887.73
Less Income Tax
21,817.37
50,070.36
BALANCE
December 31, 1961
$296,242.49
*295 Lufkin International's profit and loss statement for the year ending December 31, 1962, contained the following: SALES
$1,536,309.60
Less Sales Returns & Allowances
1,093.74
$1,535,215.86
COST OF SALES
Mdse. Purchased for Resale
$1,314,870.96
Less Purchase Returns & Allow.
1,065.10
$1,313.805.86
Inventory 12/31/61
118,969.50
Shipping Expense
4,324.13
$1,437,099.49
Less Inventory 12/31/62
117,080.08
$1,320,019.41
GROSS INCOME
$ 215,196.45
OTHER INCOME
Commissions
$ 69,106.21
Rent
2,055.39
Interest
227.74
Other Income
1,608.11
U.S. Income Tax Refund
1,674.44
$ 74,671.89
Plus Gain from Sale of Capital
846.09
$ 75,517.98
Assets
TOTAL INCOME
$ 290,714.43
EXPENSES
Auditing Expense
$ 3,768.20
Building Repair & Maintenance
1,022.16
Depreciation Expense
5,468.94
Gain or Loss on Exchange Rate
500.54
Insurance Expense
273.02
Janitorial & Yard Expense
169.08
Legal Expense
1,485.67
Office Expense
3,241.88
Office Salaries
8,535.30
Officers Salaries
3,600.00
Pension Expense
981.92
Rent Expense
1,184.87
Salaries - Warehouse
1,708.41
Salesmen's Salaries
17,283.30
Social Security Tax Expense
225.00
Social Security Tax - Venezuela
152.21
Taxes
604.10
Travel Expense
23,884.68
Utilities Expense
810.13
Miscellaneous Expense
1,763.51
$ 76,662.92
INCOME BEFORE TAXES
$214,051.51
LESS INCOME TAX
* -75,839.66
NET INCOME AFTER TAXES
$138,211.85
*296 421 Lufkin International's balance sheet as of December 31, 1962, contained the following: ASSETS
12/31/62
12/31/61
CURRENT
Cash in Banks
$ 29,361.18
$ 47,484.62
Accounts Receivable
323,492.24
95,336.72
Inventory
117,080.08
118,969.50
$469,933.50
$261,790.84
FIXED
Land
$ 37,329.36
$ 37,329.36
Buildings
$ 99,146.59
Fence
885.89
Tools & Equipment
255.39
Furniture & Fixtures
9,553.27
Automobiles
6,749.24
$116,590.38
Less Reserve for Depr.
18,329.86
$ 98,260.52
$104,171.30
$135,589.88
141,500.66
TOTAL ASSETS
$605,523.38
$403,291.50
LIABILITIES AND CAPITAL
CURRENT
Accounts Payable
$112,393.61
$ 85,459.89
Reserve for Income Tax
48,695.95
12,305.25
$161,089.56
$ 97,765.14
Accrued Taxes
(20.52)
(716.13)
$161,069.04
$ 97,049.01
CAPITAL
Capital Stock
$ 10,000.00
$ 10,000.00
Surplus
434,454.34
296.242.49
$444,454.34
$306,242.49
TOTAL LIABILITIES
AND CAPITAL
$605,523.38
$403,291.50
SURPLUS ANALYSIS - YEAR 1962
BALANCE
January 1, 1962
$296,242.49
ADD:
Income for 1962
$214,051.51
Less Income Tax
75,839.66
138,211.85
BALANCE
December 31, 1962
$434,454.34
*297 Lufkin Overseas The amount of foreign sales commissions earned by Lufkin Overseas during 1961 and 1962 was 20 percent of the net invoice price on all sales for which a Commission was received. During 1961 and 1962, Lufkin paid sales commissions to Lufkin Overseas for sales in Argentina, Bolivia, Brazil, Mexico, Colombia, and Peru. The gross sales of Lufkin and the gross commission income of Lufkin Overseas from such sales for 1961 and 1962 were as follows: 1961
1962
Gross
Gross
Commission
Commission
Income of
Income of
Gross Sales
Lufkin
Gross Sales
Lufkin
Country
by Lufkin
Overseas
by Lufkin
Overseas
Argentina
$515,117.67
$101,023.54
$478,110.76
$ 95,622.16
Bolivia
4,246.30
849.26
Brazil
148,852.24
29,770.44
181,592.38
36,318.47
Colombia
57,677.24
10,753.34
75,143.98
15,028.80
Mexico
10,864.96
2,172.99
32,540.04
6,508.01
Peru
25,628.76
5,125.75
15,038.92
3,007.76
$762,387.17
$149,695.32
$782,426.08
$156,485.20 Lufkin Overseas' profit and loss statement for the year ending December 31, 1961, contained the following: SALES
$ 28,526.13
COST OF SALES
Less Inventory 12/31/61
24,060.57
GROSS INCOME
$ 4,465.56
OTHER INCOME
Commissions Income
$149,695.32
Interest Income
19,750.45
$169,445.77
TOTAL INCOME
$173,911.33
EXPENSES
Administrative Expense
$ 15,000.00
Advertising Expense
1,806.56
Commission Expense
22,288.61
Depreciation Expense
337.01
Insurance Expense
252.00
Interest Expense
7,464.36
Legal Expense
5,889.02
Office Expense
42.28
Organization Expense
800.00
Pension Expense
849.00
Retainer Expense
6,000.00
Salesmen's Salaries
19,662.50
Social Security Expense
298.50
Travel Expense
13,259.28
Miscellaneous
250.00
$ 94,199.12
NET INCOME
$ 79,712.21
*298 Lufkin Overseas' balance sheet as of December 31, 1961, contains the following: ASSETS
12/31/61
12/31/60
CURRENT
Lufkin National Bank
$ 24,396.78
$ 22,798.88
Notes Receivable
303,082.29
486,144.05
Accrued Interest Receivable
1,898.30
2,924.29
Inventory
-
24,060.57
$329,377.37
$535,927.79
FIXED
Building
$ 20,974.44
Automobiles
3,730.00
24,704.44
Less Reserve for Depreciation
337.01
24,367.43
-
DEFERRED
Organization Expense
4,000.00
Less Reserve for Amort. or Organ.
2,400.00
1,600.00
2,400.00
Expense
TOTAL ASSETS
$355,344.80
$538,327.79
LIABILITY AND CAPITAL
CURRENT
Notes Payable
-
$255,000.00
Accrued Interest Payable
-
7,695.20
$262,695.20
CAPITAL
Capital Stock
$ 6,000.00
Surplus
349,344.80
355,344.80
275,632.59
TOTAL LIABILITIES AND CAPITAL
$355,344.80
$538,327.79
SURPLUS ANALYSIS - YEAR 1961
BALANCE
January 1, 1961
$269,632.59
ADD:
Income for 1961
79,712.21
BALANCE
December 31, 1961
$349,344.80 425 Lufkin Overseas' profit and loss statement for the period ending November 30, 1962, contained the following: INCOME
Commissions Income
$156,485.20
Interest Income
9,550.30
$166,035.50
EXPENSES
Administrative Expense
$ 15,000.00
Advertising Expense
945.46
Amortization of Organization Expense
800.00
Building Repair & Maintenance
55.00
Commissions Expense
18,956.58
Depreciation Expense
2,591.35
Insurance Expense
152.00
Legal Expense
2,703.19
Pension Expense
919.48
Retainer Expense
5,300.00
Salesmens' Salaries
16,933.30
Social Security Tax Expense
225.00
Travel Expense
10,371.90
Utilities Expense
109.00
Miscellaneous
250.00
$ 75,312.26
NET INCOME
$ 90,723.24
*299 Lufkin Overseas' balance sheet as of November 30, 1962, contained the following: ASSETS
11/30/62
12/31/61
CURRENT
Lufkin National Bank
$308,614.65
$ 24,396.78
Notes Receivable
114,133.31
303,082.29
Accrued Interest Receivable
744.00
1,898.30
$423,491.96
$329,377.37
FIXED
Building
$ 20,974.44
Automobile
3,730.00
24,704.44
Less Reserve for Depreciation
2,928.36
21,776.08
24,367.43
DEFERRED
Organization Expense
$ 4,000.00
Less Reserve for Amortz. of Organ.
3,200.00
800.00
1,600.00
Expense
TOTAL ASSETS
$446,068.04
$355,344.80
LIABILITY AND CAPITAL
CAPITAL
Capital Stock
$ 6,000.00
Earned Surplus
440,068.04
446,068.04
355,344.80
TOTAL LIABILITIES AND CAPITAL
$446,068.04
$355,344.80
SURPLUS ANALYSIS - YEAR 1962
BALANCE
January 1, 1962
$349,344.80
ADD:
Income to November 30, 1962
90,723.24
BALANCE
November 30, 1962
$440,068.04
Division of Pretax Profits Between Lufkin, Lufkin International and Lufkin Overseas as Determined by Vernon G. Garrett of Arthur Andersen & Company Mr. Vernon G. Garrett, Jr., is a certified public accountant, holding certificates from the State of Texas, *300 Louisiana, Michigan, North Carolina and Virginia. Mr. Garrett is a partner in the firm of Arthur Andersen & Co., an international firm of accountants and auditors. Mr. Garrett received a bachelor of business administration degree from Baylor University in 1947 and immediately thereafter became associated with the firm of Arthur Andersen & Co. Since 1947 he has worked continuously in the audit division of the firm which basically involves examining and reporting on financial statements of corporations, partnerships and other entities. Mr. Garrett is a member of the American Institute of Certified Public Accountants and the Texas State Society of Certified Public Accountants. Arthur Andersen & Co., is responsible for auditing the books and records of Lufkin. The first examination was conducted in 1958 and Mr. Garrett was the manager of the first audit. Since 1958 Mr. Garrett has continuously been connected with the Lufkin audit both as audit manager and, since 1962, as partner in charge of the audit. Mr. Garrett was approached by counsel for Lufkin in January of 1970 and was requested to review the books and records of Lufkin for 1961 and 1962 to determine the pretax profit of Lufkin *301 on its sales to and commission transactions with Lufkin International and Lufkin Overseas and the pretax profit of Lufkin International and Lufkin Overseas on such transactions. Prior to trial in these cases, such a review was made by Arthur Andersen & Co., under the supervision of Mr. Garrett. The internal records of Lufkin did not contain a determination of the pretax profits of Lufkin on its transactions with Lufkin International and Lufkin Overseas for 1961 and 1962. The books and records of Lufkin are kept in such a manner as to facilitate the preparation of monthly financial statements which come directly from the books and records. The financial reports are prepared on a divisional basis separated into three divisions: the machinery division, the trailer division and the mill supply division. Mr. Garrett's computation of the pretax profits of Lufkin on sales to and commission transactions with Lufkin international and Lufkin Overseas for 1961 and 1962 was prepared primarily from Lufkin's annual financial statements of Lufkin for those years. Computation of Gross Profit - 1961 Lufkin - Lufkin International Transactions In attempting to arrive at the gross profit of Lufkin *302 on commission transactions in Venezuela during 1961 upon which Lufkin International earned a commission, Mr. Garrett first reviewed all specific orders available which set forth the selling price, the total factory cost, and the gross profit to Lufkin on each order. Mr. Garrett was unable to locate all orders for 1961 for commission transactions with Lufkin International in Venezuela but did identify by specific order, on other than parts, $317,369 out of a total of $352,097 of such transactions. On commission transactions for parts sales to Venezuela during 1961 upon which Lufkin International earned a commission, one substantial parts order of approximately $7,000 was located and reviewed by Mr. Garrett. The gross profit on that order was 56 percent. This parts order represented approximately 43 percent of the parts commission transactions upon which Lufkin International earned a commission for 1961. Based on this order a gross profit figure of 56 percent was used for all other parts orders shipped to Venezuela on a commission basis for 1961 which could not be specifically identified. For all other commission transactions to Venezuela which could not be identified as either parts *303 or by specific order number, a gross profit margin of 28 percent was used. This figure was slightly less than the 28.18 percent gross profit margin earned by the machinery division of Lufkin during 1961 on sales to other customers. For all discount sales or parts from Lufkin to Lufkin International during 1961 for resale in Venezuela for which no specific orders were available, a 56 percent gross profit margin was used, which figure is consistent with the gross profit margin on the one available a Venezuelan commission parts order. On discount sales by Lufkin to Lufkin International for resale to Canada during 1961 where no specific orders could be identified, a gross profit margin of 65 percent was utilized by Mr. Garrett for all parts sales and a 28 percent gross profit margir 428 for all other discount sales to Lufkin International. This 65 percent gross profit margin on parts sales to Canada was determined on the basis of an investigation into Lufkin's parts pricing policy over a period of 10 years. Mr. Garrett was informed by the cost department of Lufkin that Lufkin's pricing policy on parts resulted in a gross profit margin between 62 1/2 percent and 68 3/4 percent during *304 the previous 10 years. Therefore, it was assumed that 65 percent was a reasonable gross profit margin on parts sales where no specific orders could be identified. In computing the gross profit of Lufkin on the discount sales to Lufkin International, the sales of Lufkin were increased by the amount of the discount allowed - $105,216. This amount was added to gross sales of Lufkin and deducted out as a selling, general and administrative expense so that the gross profit on these discount sales would be comparable with the gross profit of Lufkin on commission sales and sales to other customers. Lufkin - Lufkin Overseas Commission Transactions On Lufkin's commission transactions with Lufkin Overseas for 1961, the gross profit of Lufkin was again first determined by Mr. Garrett by reviewing specific identifiable orders. Gross sales of $643,201 out of a total of $762,387 were specifically identified. For parts transactions upon which Lufkin Overseas earned a commission for 1961, a 65 percent gross profit figure was used which, as previously indicated, was determined from a review of a 10-year history of Lufkin's gross profit margin on parts transactions. For all other transactions *305 which could not be identified as either parts or by specific order number, a gross profit figure of 28 percent was used, a figure slightly below the gross profit margin of the machinery division of Lufkin on sales to all other customers. In computing the gross profit of Lufkin on its transactions with Lufkin Overseas and Lufkin International, three inadvertent computational errors were made. The cumulative effect of the three computational errors is that the gross profit of Lufkin on its sales to and commission transactions with Lufkin International and Lufkin Overseas for 1961 is understated by $8,514. Accordingly, both the gross profit and net pretax profit of Lufkin is slightly understated for 1961. These errors in no way affect the gross profit or net pretax profit of Lufkin International and Lufkin Overseas as shown in Mr. Garrett's computations set out below. Computation of Pretax Profits - 1961 After computing the gross profit on Lufkin on its transactions with Lufkin International and Lufkin Overseas for 1961, Mr. Garrett next reviewed the expense account entitled "Selling, General and Administrative Expenses" from Lufkin's financial statements to determine what expenses *306 should be allocated to Lufkin as a result of the discount sales and commission transactions with Lufkin International and Lufkin Overseas to arrive at a pretax profit for Lufkin on these transactions. The Selling, General and Administrative Expense Account is broken down in four categories: (1) Trailer Administrative and Selling Expense, (2) Mill Supply Administrative and Selling Expense, (3) Machinery Administrative and Selling Expense, and (4) General and Administrative Expenses. None of the expenses of the Trailer or Mill Supply Administrative and Selling Expense accounts were allocated to Lufkin as a result of Lufkin's transactions with Lufkin International and Lufkin Overseas during 1961. With regard to the Machinery Administrative and Selling Expense account portion of the Selling, General and Administrative Expenses, the accounts of Engineering Development and Design, Industrial Engineering Department and Cost Planning and Payroll were expense accounts which Mr. Garrett reviewed and concluded did apply to all sales (including exports) in the machinery division of Lufkin and, accordingly, should be allocated to Lufkin as a result of its sales to and commission transactions *307 with Lufkin International and Lufkin Overseas. These expense accounts were allocated on a cost of sales basis, i. e., total cost of sales to Lufkin International, Lufkin Overseas and other customers to total cost of sales of the machinery division of Lufkin. Expense accounts of the Order Department, Shipping Expense and Advertising Expense were also allocated to Lufkin as a result of Lufkin's sales to and commission transactions with Lufkin International and Lufkin Overseas to determine Lufkin's pretax profit. However, it was determined that these three expense items applied to all business done by Lufkin and, accordingly, these expenses were allocated on a direct sales basis rather than a cost of sales basis. The expense accounts of Sales and Service Salaries and Branch Office Expense were reviewed and it was determined that these expenses should generally not be allocated to Lufkin as a result of its transactions with Lufkin International and Lufkin Overseas because each of these companies had their own sales department and sales personnel. However, it was determined that a portion of the costs of the New York office, which costs did relate to Lufkin International's business *308 in Venezuela (but not Canada) and to all of Lufkin Overseas' business, should be allocated to Lufkin to properly determine Lufkin's pretax profit on transactions with Lufkin International and Lufkin Overseas. Mr. Garrett inquired of representatives of Lufkin as to the cost of the New York office and was informed that approximately $22,000 per year was applicable to the operations of both Lufkin International and Lufkin Overseas. Since the business of Lufkin Overseas, as compared with the Venezuelan portion of Lufkin International's business, was approximately twice as much in terms of volume of sales, Mr. Garrett concluded that of the $22,000 of New York office expense which was applicable to both Lufkin Overseas and Lufkin International, $15,000 should be charged to Lufkin Overseas and $7,000 should be charged to Lufkin International. Because Lufkin had made an intercorporate charge of $15,000 to Lufkin Overseas, which charge included a substantial amount applicable to the Ney York office, Mr. Garrett concluded that approximately $12,000 of the $15,000 that should be allocated to Lufkin Overseas had already been charged through in the intercorporate charge. Accordingly, Mr. Garrett *309 determined that the appropriate allocation of the New York office expense account was $7,000 for Lufkin International and $3,000 for Lufkin Overseas. The expense accounts of Travel and Entertain7ent Expense and Home Office Customer Entertainment was not allocated to Lufkin as a result of transactions with Lufkin International and Lufkin Overseas because each had its own travel expense accounts and, moreover, Lufkin had already made an intercorporate charge for what it had determined was the appropriate travel expense applicable to both these companies. The General and Administrative Expense account portion of the Selling, General and Administrative Expense account of Lufkin was also reviewed by Mr. Garrett to determine if any items of expense in that area were applicable to Lufkin's transactions with either Lufkin International or Lufkin Overseas. Mr. Garrett concluded that none of these expense accounts should be allocated to Lufkin to determine its pretax profit on transactions with Lufkin International and Lufkin Overseas. The Other Expenses and Other Income categories of Lufkin's financial statements for 1961 were also reviewed by Mr. Garrett to determine whether any of these *310 items were applicable to Lufkin's transactions with Lufkin International or Lufkin Overseas. Mr. Garrett concluded that persion costs of Lufkin were directly related to labor, and, accordingly, a portion thereof should be allocated. Inquiries with Lufkin personnel indicated that in recent years Lufkin had made a detailed study of pension expenses and related such expenses to payroll costs. Presently Lufkin allocated 60 percent of pension costs to manufacturing operations and 40 percent of pension costs to the general and administrative area of Lufkin's business. Sixty percent of Lufkin's pension cost for 1961 was $144,406. The alocation of pension costs, however, was not made on a cost of sales or a direct sales basis. The recent study made by Lufkin indicated that approximately 71 percent of the pension cost for manufacturing operations was directly attributable to the machinery division. $103,741 of the pension cost was therefore allocated to the machinery division which resulted in a higher figure than had a sales or cost of sales method of allocation been used between the three divisions. The expense account Discount on Purchases was allocated between the three divisions on a *311 cost of sales basis because it was concluded that this expense item related primarily to cost of sales. In reviewing the other accounts that made up Other Expenses and Other Income, no allocation was thought necessary with regard to Lufkin's transactions with Lufkin International and Lufkin Overseas. Based on Mr. Garrett's computations, the pretax profit of Lufkin on sales to and commission transactions with Lufkin International and Lufkin Overseas and the pretax profit of Lufkin International and Lufkin Overseas on such transactions for 1961 was as follows: 429 SUMMARY OF "PRETAX PROFIT" TO
LUFKIN PARENT ON SLES TO AND
COMMISSION TRANSACTIONS WITH
LUFKIN INTERNATIONAL AND
LUFKIN OVERSEAS AND SALES TO
OTHER CUSTOMERS AND "PRETAX
PROFIT" TO LUFKIN
INTERNATIONAL AND LUFKIN
OVERSEAS ON SUCH TRANSACTIONS
FOR 1961
To Lufkin
Parent
Machinery Division
To Lufkin
International
Sales to
Lufkin
Sales to
Sales to
Inter-
Lufkin
Other
national
Overseas
Customers
Total
Net sales
$ 878,126
$ 762,387
$13,579,306
$15,219,819
Cost of sales
583,244
507,291
9,752.987
10,843,522
Gross profit
$294,882
$255,096
$ 3,826,319
$ 4,376,297
Gross profit %
33.58%
Gross profit %
33.58%
33.46%
28.18%
28.75%
Commission income
Selling, general and
administrative expenses -
Machinery administrative and
$ 212,978
$ 179,069
$ 1,572,834
$ 1,964,881
selling expense
Trailer administrative and
selling expense
Mill supply administrative
and selling expense
General and administrative
565,302
expense
$ 212,978
$ 179,069
$ 2,138,136
$ 2,530,183
Operating income (loss)
$ 81,904
$ 76,027
$ 1,688,183
$ 1,846,114
Other expense less (income) -
Pension (60%)
$ 5,579
$ 4,852
$ 93,310
$ 103,741
Discount on purchases
(2,389)
(2,077)
(39,933)
(44,399)
All other (net) including
42,066
42,066
pension (40%)
$ 3,190
$ 2,775
$ 95,443
$ 101,408
Pretax profit (loss)
$ 78,714
$ 73,252
$ 1,592,740
$ 1,744,706
$ 71,888
$ 79,712
Percent of sales
9.0%
9.6%
11.7%
11.5%
*312 SUMMARY OF "PRETAX PROFIT" TO
LUFKIN PARENT ON SLES TO AND
COMMISSION TRANSACTIONS WITH
LUFKIN INTERNATIONAL AND
LUFKIN OVERSEAS AND SALES TO
OTHER CUSTOMERS AND "PRETAX
PROFIT" TO LUFKIN
INTERNATIONAL AND LUFKIN
OVERSEAS ON SUCH TRANSACTIONS
FOR 1961 Machinery Division
To Lufkin International
Lufkin
Other
Elimi-
Parent
Divisions
nations
Total
Business
Net sales
$6,335,216
$ (105,216)
$21,449,819
$ 506,680
Cost of sales
5,353,370
16,196,892
423,910
Gross profit
$ 981,846
[105,216)
$ 5,252,927
$ 82,770
Gross profit %
Gross profit %
15.50%
24.49%
Commission income
70,420
$ 153,190
Selling, general and
administrative expenses -
Machinery administrative and
$ (105,216)
$ 1,859,665
$ 63,127
selling expense
Trailer administrative and
730,351
730,351
selling expense
Mill supply administrative
224,087
224,087
and selling expense
General and administrative
565,302
150,188
715,490
expense
$1,104,626
$ (105,216)
$ 3,529,593
$ 87,544
Operating income (loss)
$ (122,780)
$ 1,723,334
$ 65,645
Other expense less (income) -
Pension (60%)
$ 40,665
$ 144,406
$ 1,034
Discount on purchases
(21,919)
(66,318)
All other (net) including
26,209
68,275
pension (40%)
$ 44,955
$ 146,363
$ 1,034
Pretax profit (loss)
$ (167,735)
$ 1,576,971
$ 64,612
$ 71,888
Percent of sales
7.4%
7.5% *313 SUMMARY OF "PRETAX PROFIT" TO
LUFKIN PARENT ON SLES TO AND
COMMISSION TRANSACTIONS WITH
LUFKIN INTERNATIONAL AND
LUFKIN OVERSEAS AND SALES TO
OTHER CUSTOMERS AND "PRETAX
PROFIT" TO LUFKIN
INTERNATIONAL AND LUFKIN
OVERSEAS ON SUCH TRANSACTIONS
FOR 1961 Machinery Division
Unrelated
To Lufkin
Business
total
Overseas
Net sales
$ 506,680
$ 28,526
Cost of sales
423,910
24,060
Gross profit
$ 82,770
$ 4,466
Gross profit %
Gross profit %
Commission income
70,420
149,695
$ 153,190
$ 154,161
Selling, general and
administrative expenses -
Machinery administrative and
$ 63,127
$ 57,316
selling expense
Trailer administrative and
selling expense
Mill supply administrative
and selling expense
General and administrative
24,417
24,417
28,570
expense
$ 87,544
$ 85,886
Operating income (loss)
$ 65,646
$ 68,275
Other expense less (income) -
Pension (60%)
$ 1,034
$ 849
Discount on purchases
All other (net) including
$ (7,276)
(7,276)
(12,286)
Unrelated
pension (40%)
Interest
$ (7,276)
$ (6,242)
$ (11,437)
Pretax profit (loss)
$ 7,276
$ 71,888
$ 7,276
$ 71,888
Percent of sales
*314 LUFKIN FOUNDRY AND MACHINE COMPANY SALES TO INTERNATIONAL 1961
Gross
Total
Profit
No. of
Part
Selling
Factory
Gross
Per-
Order Number
Units
Number
Price
Cost
Profit
Centage
For sales in Venezuela--
Commission sales
222691
4
A456D-
120-36
$ 67,544
$ 46,714
$ 20,830
229010
7
A912D
106,514
60,466
46,048
222173
4
A640D
51,403
34,992
16,411
229204
6
A912D
91,908
61,828
30,080
$317,369
$204,000
$113,369
Parts
16,260
7,154
9,106
56%
Other
18,468
13,297
5,171
28%
Total Commis- sion sales
$352,097
$224,451
$127,646
Discount sales--parts
32,384
14,249
18,135
56%
Total for sales
in Venezuela
$384,481
$238,700
$145,781
For sales in Canada--
discount sales Parts
$ 28,651
$ 10,028
$ 18,623
65%
Other
464,994
334,516
130,478
28%
Total for sales in Canada
$493,645
$344,544
$149,101
$878,126
$583,244
$294,882
LUFKIN FOUNDRY AND MACHINE COMPANY SALES TO OVERSEAS FOR
COMMISSION SALES 1961
Gross
Total
Profit
Order
No. of
Part
Selling
Factory
Gross
Per-
Number
Units
Number
Price
Cost
Profit
centage
226013
10
A640D
$131,460
$ 87,480
$ 43,980
219963
7
A640D
95,886
61,236
34,650
225599
10
A640d
131,457
87,480
43,977
225805
10
A640d
135,546
87,480
48, 066
229193
10
C57D
37,213
31,434
5,779
229195
10
C57D
37,213
31,434
5,779
229196
10
C57D
37,213
31,434
5,779
229197
10
c57d
37,213
31,434
5,779
$643,201
$449,412
$193,789
Parts
75,498
26,424
49,074
65%
Other
43,688
31,455
12,233
28%
$762,387
$507,291
$255,096
*315 The pretax profit of Lufkin on its sales to and commission transactions with Lufkin International for 1961 amounted to $78,714 or 9.0 percent of net sales. In computing this percentage figure the sales of Lufkin were grossed up by the discount factor, $105,216, to place them on a comparable basis with commission sales and sales to other customers. The pretax profit of Lufkin on its commission transactions with Lufkin Overseas for 1961 was $73,252 or 9.6 percent of net sales. 432 The pretax profit of Lufkin International on its transactions with Lufkin for 1961 was $64,612 or 7.5 percent of net sales. These figures were taken directly from the financial statements of Lufkin International for 1961. The pretax profit of Lufkin Overseas on its transactions with Lufkin for 1961 was $79,712 or 8.5 percent of net sales. These figures were taken directly from the financial statements of Lufkin Overseas for 1961. The 8.5 percent figure was computed after excluding from income unrelated interest income earned by Lufkin Overseas during 1961, an amount of $12,286. Computation of Gross Profit - 1962 Mr. Garrett also reviewed the books and records of Lufkin for 1962 to determine *316 the pretax profit of Lufkin on sales to and commission transactions with Lufkin International and Lufkin Overseas for 1962. Gross profit of Lufkin on transactions with Lufkin International and Lufkin Overseas was again determined first by reviewing specific orders which were available for 1962. Lufkin - Lufkin International Transactions On Venezuelan commission transactions of Lufkin International for 1962, specific orders were reviewed for $218,174 out of a total of $345,531. To the extent specific gross profit figures were unavailable, Mr. Garrett used a 56 percent gross profit figure on parts transactions to Venezuela and 30 percent on all other identifiable commission transactions. The 30 percent gross profit figure is slightly less than the 30.22 percent gross profit margin earned by the machinery division of Lufkin for 1962 on sales to other customers. On Lufkin's sales to Lufkin International for resale to Lufkin Canada, a gross profit figure of 65 percent was used for parts sales and 30 percent on all other sales which could not be specifically identified by order number or as parts. In determining net sales of Lufkin on discount sales to Lufkin International for 1962, *317 a gross sales figure of $1,764,145 was arrived at by grossing up the discounts allowed Lufkin International in an amount of $283,722. The discount was then deducted as a Machinery Administrative and Selling Expense to determine pretax profit. Lufkin - Lufkin Overseas Transactions The gross profit of Lufkin on commission transactions with Lufkin Overseas for 1962 was determined by first reviewing specific identifiable orders. Specific orders were located covering $478,002 out of a total of $782,426 of commission sales for 1962. A gross profit margin of 65 percent was used for unidentifiable parts transactions and a gross profit figure of 30 percent was used for all other transactions not specifically identifiable by order number or as parts. Computation of Pretax Profits - 1962 Mr. Garrett reviewed the Selling, General and Administrative Expense account of Lufkin to determine whether any of such expenses were applicable to the transactions with Lufkin International and Lufkin Overseas and thus allocable to Lufkin in determining pretax profits. Allocations to expenses were made in the same manner as the allocations for 1961. Thus, the expense accounts Engineering Development *318 and Design, Industrial Engineering Department and Cost, Planning and Payroll were all allocated on a cost of sales basis. The accounts Order Department, Shipping Expense and Advertising Expense were allocated on a sales basis. The New York office expense as well as all other accounts for 1962 were allocated on the same basis as the 1961 allocation. On the basis of Mr. Garrett's computations, the pretax profit of Lufkin on sales to and commission transactions with Lufkin International and Lufkin Overseas and the pretax profit of Lufkin International and Lufkin Overseas on such transactions for 1962 was as follows: 433 SUMMARY OF "PRETAX PROFIT" TO
LUFKIN PARENT ON SALES TO AND
COMMISSION TRANSACTIONS WITH
LUFKIN INTERNATIONAL AND
LUFKIN
OVERSEAS AND SALES TO OTHER
CUSTOMERS AND "PRETAX PROFIT"
TO LUFKININTERNATIONAL AND
LUFKIN OVERSEAS ON SUCH
TRANSACTIONS FOR 1962
To Lufkin
Parent
Machinery
Division
Sales to
Lufkin
Sales to
Sales to
Inter-
Lufkin
Other
national
Overseas
Customers
Total
nations
Total
Busincess
Business
Net sales
$1,764,145
$ 782,426
$18,034,764
$20,581,335
Cost of sales
1,158,770
520,447
12,584,451
14,263,668
Gross profit
$ 605,375
$ 261,979
$ 5,450,313
$ 6,317,667
Gross profit %
34.32%
33.48%
Gross profit%
$34.32%
33,48%
30,22%
30.70%
Commission income
Selling, general and
administrative expenses -
Machinery administrative and
$ 405,606
$ 179,935
$ 1,715,863
$ 2,301,404
selling expense
Trailer administrative and
selling expense
Mill supply administrative
and selling expense
General and administrative
568,657
568,657
expense
$ 405,606
$ 179,935
$ 2,284,520
$ 2,870,061
Operating income
$ 199,769
$ 82,044
$ 3,165,793
$ 3,447,606
Other expense less (income) -
Pension (60%)
$ 13,746
$ 6,174
$ 149,297
$ 169,217
Discount on purchases
(4,476)
(2,010)
(48,618)
(55,104)
All other (net) including
(26,604)
(26,604)
pension (40%)
$ 9,270
$ 4,164
$ 74,075
$ 87,509
Pretax profit (excluding
$ 190,499
$ 77,880
$ 3,091,718
$ 3,360,097
dividend from subsidiary)
Percent of sales
10.8%
10.0%
17.1%
16.3%
Dividend from subsidiary
Total pretax profit
*319 SUMMARY OF "PRETAX PROFIT" TO
LUFKIN PARENT ON SALES TO AND
COMMISSION TRANSACTIONS WITH
LUFKIN INTERNATIONAL AND
LUFKIN
OVERSEAS AND SALES TO OTHER
CUSTOMERS AND "PRETAX PROFIT"
TO LUFKININTERNATIONAL AND
LUFKIN OVERSEAS ON SUCH
TRANSACTIONS FOR 1962
To Lufkin
To Lufkin
International
International
Lufkin
Other
Elimi-
$ Part
Unrelated
Divisions
nations
Total
Business
Net sales
$8,441,022
$ (283,722)
$28,738,635
$1,298,345
Cost of sales
6,999,237
21,262,905
1,134,892
Gross profit
$1,441,785
$ (283,722)
$ 7,475,730
$ 163,453
Gross profit %
Gross profit%
17.08%
26.01%
Commission income
69,106
$ 232,559
Selling, general and
administrative expenses -
Machinery administrative and
$ (283,722)
$ 2,017,682
$ 41,561
selling expense
Trailer administrative and
758,507
758,507
selling expense
Mill supply administrative
259,801
259,861
and selling expense
General and administrative
170,698
739,355
22,995
expense
$1,189,066
$ (283,722)
$ 3,775,405
$ 64,556
Operating income
$ 252,719
$ 3,700,325
$ 168,003
Other expense less (income) -
Pension (60%)
$ 66,330
$ 235,547
$ 838
Discount on purchases
(27,017)
(82,121)
All other (net) including
(11,402)
(38,006)
pension (40%)
$ 27,911
$ 115,420
$ 838
Pretax profit (excluding
$ 224,808
$ 3,584,905
$ 167,165
dividend from subsidiary)
Percent of sales
2.7%
12.5%
9.5%
Dividend from subsidiary
144,385
Total pretax profit
$ 3,729,290
*320 SUMMARY OF "PRETAX PROFIT" TO
LUFKIN PARENT ON SALES TO AND
COMMISSION TRANSACTIONS WITH
LUFKIN INTERNATIONAL AND
LUFKIN
OVERSEAS AND SALES TO OTHER
CUSTOMERS AND "PRETAX PROFIT"
TO LUFKININTERNATIONAL AND
LUFKIN OVERSEAS ON SUCH
TRANSACTIONS FOR 1962
To Lufkin
Business
Total
Overseasisions
Net sales
$ 236,871
$1,535,216
Cost of sales
185,127
1,320,019
Gross profit
$ 51,744
$ 215,197
Gross profit %
Gross profit%
Commission income
69,106
$ 156,485
$ 51,744
$ 284,303
$ 156,485
Selling, general and
administrative expenses -
Machinery administrative and
$ 7,162
$ 48,723
$ 47,432
selling expense
Trailer administrative and
selling expense
Mill supply administrative
and selling expense
General and administrative
3,963
26,958
26,961
expense
11,125
75,681
74,393
Operating income
$ 40,619
$ 208,622
$ 82,092
Other expense less (income) -
Pension (60%)
$ 144
$ 982
$ 919
Discount on purchases
All other (net) including
(6,412)
(6,412)
(9,550)
Interest
pension (40%)
Unrelated
$ (6,268)
$ (5,430)
$ (8,631)
Pretax profit (excluding
$ 46,887
$ 214,052
$ 90,723
dividend from subsidiary)
Percent of sales
19.8%
10.7%
10.4%
Dividend from subsidiary
Total pretax profit
*321 LUFKIN FOUNDRY AND MACHINE COMPANY SALES TO INTERNATIONAL
1962
Gross
Total
Profit
Order
No. of
Part
Selling
Factory
Gross
Per-
Number
Units
Number
Price
Cost
Profit
centage
For sales in
Venezuela--Commission
sales
230250
5
A912D
$ 76,368
$ 43,190
$ 33,178
230251
5
A912D
76,345
43,190
33,155
236679
6
A456D
65,461
44,906
20,555
$218,174
$131,286
$ 86,888
Parts
72,172
31,756
40,416
56%
Other
55,185
38,629
16,556
30%
Total Commission sales
$345,531
$201,671
$143,860
Discount sales--parts
45,152
19,867
25,285
56%
Total for sales In
$390,683
$221,538
$169,145
Venezuela
For sales in
Canada--discount sales
Parts
$ 69,117
$ 24,191
$ 44,926
65%
Other
1,304,345
913,041
391,304
30
Total for sales in
$1,373,462
$937,232
$436,230
Canada
$1,764,145
$1,158,770
$605,375
LUFKIN FOUNDRY AND MACHINE COMPANY
SALES TO OVERSEAS FOR
COMMISSION SALES
1962
Gross
Total
Profit
Order
No. of
Part
Selling
Factory
Gross
Per-
Number
Units
Number
Price
Cost
Profit
centage
237029
20
A640D
$267,896
$174,960
$ 92,936
237575
2
A912D
32,268
18,534
13,734
237722
15
c160d
110,129
85,864
24,265
229302
10
C160D
67,709
52,813
14,896
$478,002
$332,171
$145,831
Parts
70,917
24,821
46,096
65%
Other
233,507
163,455
70,052
30%
$782,426
$520,447
$261,979
*322 435 LUFKIN FUNDRY AND MACHINE COMPANY MACHINERY ADMINISTRATIVE AND SELLING
EXPENSE 1962
Allocated to
Sales to
Lufkin
Sales to
Sales to
Inter-
Lufkin
Other
national
Overseas
Customers
Eliminations
Total
Engineering
$ 246,068
development and
design
Industrial
43,807
engineering
department
Cost planning and
30,416
payroll
Total allocated on
$ 26,020
$ 11,687
$ 282,584
$ 320,291
cost of sales basis
Order department
48,536
Shipping expense
65,389
Shipping expense
65,389
Advertising
112,463
Total allocatedon
$ 19,758
$ 8,763
$ 197,867
$ 226,388
sales basis
Sales and service
$ 650,789
salaries
Branch expense
243,715
Total allocated on
$ 7,000
$ 3,000
$ 884,504
$ 894,504
estimated cost of
New York office and
estimates of
applicable time
Commissions and
$ 68,742
$ 68,742
royalties
Commissions to
$ 69,106
69,106
International
Commissions to
156,485
7,974
164,459
Overseas
Travel and
258,696
258,696
entertain- ment
expense
Home office customer
13,345
13,345
entertainment
Miscellaneous
2,151
2,151
Discounts
283,722
($283,722)
Total other
$352,828
$156,485
$ 350,908
(283,722)
$ 576,499
$405,606
$179,935
$1,715,963
($283,722)
$2,017,682
*323 436 The pretax profit of Lufkin on its sales to and commission transactions with Lufkin Internal for 1962 amounted to $190,499 or 10.8 percent of net sales under Mr. Garrett's computations. The pretax profit of Lufkin on its commission transactions with Lufkin Overseas for 1962 amounted to $77,880 or 10.0 percent of net sales under Mr. Garrett's computations. The pretax profit of Lufkin International on its transactions with Lufkin for 1962 amounted to $167,165 or 9.5 percent of net sales. The pretax profit of Lufkin Overseas on its transactions with Lufkin for 1962 was $90,723 or 10.4 percent of net sales. Mr. Garrett was of the opinion that the determination of pretax profit of Lufkin, Lufkin International and Lufkin Overseas for 1961 and 1962 was reasonable and as fair a determination as could be made under the circumstances. Division of Pretax Profits as Determined by Vernon G. Garrett For 1961 and 1962, the pretax profit of Lufkin on sales to and commission transactions with Lufkin International, the pretax profit of Lufkin International on such transactions and the division of pretax profits between two companies was as follows: (1)
(2)
(3)
(4)
(5)
Pretax Profit
Lufkin
(1) as a
(2) as a
Year
Lufkin
International
Total
% of (3)
% of (3)
1961
$ 78,714
$ 64,612
$143,326
54.92%
45.08%
1962
190,499
167,165
357,664
53.26%
46.74%
*324 For 1961 and 1962 the pretax profit of Lufkin on commission transactions with Lufkin Overseas, the pretax profit of Lufkin Overseas on such transactions and the division of pretax profits between the two companies was as follows: (1)
(2)
(3)
(4)
(5)
Pretax Profit
Lufkin
(1) as a
(2) as a
Year
Lufkin
Overseas
Total
% of (3)
% of (3)
1961
$73,252
$67,426
$140,678
52.07%
49.93%
1962
77,880
81,173
159,053
48.96%
51.04%
Ultimate Findings of Facts 1. Respondent has abused his discretion in determining that certain commissions paid and discounts allowed by Lufkin to Lufkin Overseas and Lufkin International should be reallocated to Lufkin in properly computing Lufkin's taxable income for the years 1961 and 1962. 2. During the years 1961 and 1962, Lufkin International qualified as a Western Hemisphere trade corporation because all of its business was conducted in the Western Hemisphere. More than 95 percent of its gross income for the three year periods ending December 31, 1961, and December 31, 1962, was derived from sources without the United States, and more than 90 percent of its gross income for these same three *325 year periods was derived from the active conduct of a trade or business. Opinion The issues for decision are (1) whether respondent is authorized under section 482 [2] to disallow certain commissions paid or discounts granted by Lufkin Foundry and Machine Company to its subsidiaries, 437 Lufkin International and Lufkin Overseas, during the years 1961 and 1962, thus reallocating a portion of each subsidiary's gross income to the parent, Lufkin Foundry and Machine Company; (2) whether petitioner, Lufkin Foundry and Machine Company International, properly qualified as a Western Hemisphere trade corporation within the meaning of section 921[3] during the years 1961 and 1962. *326 Respondent argues that, as a result of the inter-company dealings involved in this case, Lufkin has shifted certain amounts that would normally have been its own profits to two of its wholly-owned subsidiaries. Accordingly, under the authority of section 482 and the regulations [4] thereunder, respondent has reallocated portions of the gross income of each of these subsidiaries to Lufkin. *327 Under section 482 the respondent has been granted broad authority to reallocate income, deductions, credits, or allowances when necessary to prevent tax evasion or to clearly reflect income. Unless his reallocation is shown to be arbitrary, unreasonable or without justification, he must be sustained. Grenada Industries, Inc., 17 T.C. 231 (1951), affd., 202 F. 2d 873 (C.A. 5, 1952), certiorari denied 346 U.S. 819 (1953); hall v. Commissioner, 294 F. 2d 82 (C.A. 5, 1961), affirming 32 T.C. 390 (1959); Ballantine Motor Co. v. Commissioner, 321 F. 2d 796 (C.A. 4, 1963), affirming 39 T.C. 348 (1962). As we stated in Huber Homes, Inc., 55 T.C. No. 60: In order to prevent the artificial shifting of income from one related business to another, section 482 places a controlled taxpayer on a parity with an uncontrolled taxpayer, by determining according to the standard of an uncontrolled taxpayer, the true net income of a controlled taxpayer. See, e.g., Asiatic Petroleum Co. v. Commissioner, 79 F. 2d 234, 236 (C.A. 2), affrming 31 B.T.A. 1152, certiorari denied *328 296 U.S. 645, rehearing denied 296 U.S. 664; Simon J. Murphy Co. v. Commissioner, 231 F. 2d 639, 643 (C.A. 6), reversing 22 T.C. 1341; Oil Base, Inc. v. Commissioner, 362 F. 2d 212, 214 (C.A. 9), certiorari denied, 385 U.S. 928 Baldwin-Lima-Hamilton Corp. v. United States, - F. 2d -, - (C.A. 7); Regs. section 1.482-1(b) and 1.482-1(c). Thus, income which has been artificially diverted to one member of a controlled group but which in fact was earned by another member of the group may be "allocated" by the Commissioner under section 482 to the entity which really earned it. The burden of showing that respondent's reallocation of income or deductions under section 482 is arbitrary, capricious or unreasonable rests upon the petitioner. Nat Harrison Associates, Inc., 42 T.C. 601 (1964). Respondent not only argues that Lufkin has failed to establish that it utilized arm'slength commissions and arm's-length 438 discounts in its dealings with its controlled subsidiaries, International and Overseas, but also suggests that if a comparison can be made, Lufkin's transactions with Lufkin Canada, *329 another controlled subsidiary,kfounded prior to the incorporation of Lufdin International and Lufkin Overseas, where Lufkin supplied its products at list price less a 10 percent discount, provide the most comparable sales against which the propriety of Lufkin's transactions with Lufkin International and Lufkin Overseas should be measured. Respondent commences his argument with an inquiry into why Lufkin Canada would give up an exclusive distributorship for Western Canada with Lufkin in 1954 in exchange for a non-exclusive distributorship with Lufkin International. According to the contract between Lufkin and Lufkin Canada, which the parties have stipulated, this arrangement was cancellable by either party upon the giving of 90-day's written notice. Therefore, Lufkin Canada really had no choice in the matter. Additionally, Lufkin wished to arrange its Western Hemisphere operations so as to take advantage of the favorable tax treatment accorded qualifying Western Hemisphere trade corporations by section 922. Such a rearrangement does not constitute a form of proscribed tax avoidance. See Rev. Rul. 70-238, 1970-1 C.B. 61; 438 A.P. g/reen Export Company v. United States, 284 F. 2d 383 (Ct. Cl. 1960); *330 Barber-Greene Americas, Inc., 35 T.C. 365 (1959), acq. 1964-2 C.B. 4; Pan American Eutectic Welding Alloys Co., Inc., 36 T.C. 284 (1960), acq. 1964-2 C.B. 6. Lufkin also wished to integrate all of its Western Hemisphere operations into one corporate vehicle and shift to this corporation the costs associated with exporting its goods, related overhead expenses, and the risks of doing business in the various countries of the Western Hemisphere. Respondent notes that prior to the incorporation of Lufkin International, Lufkin Canada operated as a successful subsidiary, reselling Lufkin products at a gross profit of 10 percent. Lufkin has demonstrated that the operations conducted by Lufkin Canada are not at all comparable with the business activities of Lufkin International and Lufkin Overseas. Lufkin Canada not only sold Lufkin products, but also acted as a distributor for Gaso Pump & Burner Manufacturing Company (Gaso) and earned a 10 percent gross profit on Gaso pumps and 25 percent gross profit on Gaso parts. Lufkin Canada earned this gross profit despite the fact that virtually no promotion, servicing, or installation activities *331 were Canada. Lufkin Canada also provided its own counterweights for Lufkin pumping units, enabling it to increase its profit margin on sales of these units. Moreover, Lufkin Canada was operating in an English speaking, dollar economy where it was less expensive to operate than in Latin America. Finally, the discount level between Lufkin and Lufkin Canada was set as low as possible to satisfy Canadian tax authorities and also to retain as much of the earnings as possible in the United States since it was not known at the outset whether Lufkin Canada would be successful. Hence, we see no justification for utilizing the Lufkin-Lufkin Canada transactions as a yardstick with which to measure the transactions between Lufkin and Lufkin International and Lufkin Overseas. Respondent next states that Lufkin's pricing arrangements with its subsidiaries were not based upon any study of comparable commission rates paid to unrelated parties, did not purport to be a measure of the commission rate that would have been paid to an unrelated party, and contained major elements clearly not part of an arm'slength negotiated rate. Lufkin does not argue that it ever made a detailed study of comparable *332 commission rates. Rather, Lufkin points out that at the time the pricing arrangements in issue were set, no such elaborate steps were required. Lufkin also states, in answer to respondent's second allegation, that its contracts with Lufkin International and Lufkin Overseas did indeed specifically purport to fix arm's-length charges and/or commissions on their transactions, as evidenced by the wording of the agreements. Finally, respondent attacks the consideration given to the possible need for manufacturing operations in Latin America by Lufkin when its pricing arrangements with its subsidiaries were being worked out. Not only has respondent failed to show that such a consideration was dominant in establishing the pricing arrangements in issue, but he even acknowledges that under normal circumstances consideration would be given to the need for growth capital by unrelated parties. It is apparent that such 439 a need was anticipated here and was precisely one of the factors recognized by Lufkin. In reviewing Lufkin's actions in this regard, we see that following the organization of Lufkin International, Lufkin and Lufkin International entered into an agreement which provided, *333 in part, as follows: Lufkin shall allow INTERNATIONAL deductions on its list price, which may vary from time to time by mutual agreement. In determining what prices shall be, Lufkin agrees to take into account the necessity of making the price competitive in the market in which the product is sold and to fairly compensate INTERNATIONAL for its promotional and sales efforts abroad. INTERNATIONAL agrees that [Lufkin] is to receive a fair and reasonable profit for the manufacture of the products sold to INTERNATIONAL for resale abroad wherever possible. Prices shall be determined as if the parties were unrelated and INTERNATIONAL shall receive no greater deductions from list prices than an independent third party performing identical services. A similar agreement, set out in our findings of fact, was also entered into by Lufkin and Lufkin Overseas. By the terms of these contracts it appears that Lufkin was well aware of the need to, and desired to, set commissions and prices at a level equivalent to those which might be arrived at by unrelated parties dealing at arm's-length. To achieve this result, Lufkin sought to provide for a fair division of profits between the manufacturer, *334 Lufkin, and the export sales and service companies, Lufkin Internation and Lufkin Overseas. In setting the commission and discount levels, Lufkin considered: 1. The services Lufkin International and Lufkin Overseas would perform in developing and expanding international markets for Lufkin's equipment, most of which had theretofore been completely undeveloped markets. 2. The repair services and installation activities that sales engineers of Lufkin International and Lufkin Overseas would perform for which no payment would be received. 3. The cost involved in establishing warehousing facilities to furnish customers with immediate on-the-spot spare and replacement parts. 4. The cost of establishing local manufacturing operations to compete with local foreign competitors and the time and expense of making investigations into such manufacturing operations. 5. The cost of utilizing agents in Latin America who would be paid both a commission on all equipment sold in their territory regardless of whether they participated in the sale and a monthly retainer fee. 6. The time and expense of training agents in Latin America. 7. The high cost of living in Latin American countries *335 such as Venezuela. 8. The expenses involved in serving a geographically large market. 9. The risks, difficulties and costs which might be encountered from expropriation and confiscation. 10. The risks and costs which might be encountered from losses arising from credit extended to customers. 11. Exposure to tort and contract liability. Lufkin also was cognizant of the fact that direct costs associated with exports and overhead expenses would be charged to Lufkin International and Lufkin Overseas, to the extent these expenses related to sales made by them. Similarly, administrative expenses allocable to activities of these subsidiaries would also be charged to them. These expenses had never been charged to Lufkin Canada. Finally, Lufkin realized that its export business was more profitable than its domestic business and orders for export almost always provided substantial lead time, enabling production to be scheduled during slack periods. Moreover, inventory for such orders could be maintained at a lower level than for domestic orders. With these factors in mind, Lufkin's management attempted to set what they believed were pricing arrangements equivalent to those which would *336 be arrived at between unrelated parties dealing at arm's-length. We are convinced that the pricing arrangements adopted here provided Lufkin International and Lufkin Overseas with the "share of the profits [they would] have demanded and received if [they] had been dealing with a stranger." Nat Harrison Associates, Inc., supra at 622. [5]
We think this conclusion is inescapable, considering the services performed by these 440 controlled entities and the percentage of the profits ultimately realized by them. In Latin America both Lufkin International and Lufkin Overseas were clearly instrumental in soliciting orders for Lufkin products and maintaining good customer relations by providing technical assistance and on-the-spot servicing of Lufkin products. By the years in issue Lufkin International had established complete warehousing facilities in Maracaibo and Anaco, Venezuela, with a substantial inventory of replacement parts. Lufkin Overseas had extended over $486,000 in credit to the Loeb Rhodes Development Company in Argentina to facilitate the sale of Lufkin pumping units. In sum, both *337 subsidiary companies were fully operative, incurring normal expenses of operating and bearing risks customarily associated with such operation. In addition to the details of how the pricing arrangements in issue were arrived at, petitioners have also provided us with a detailed analysis of their results, in terms of the pretax profit of Lufkin, Lufkin International, and Lufkin Overseas. These computations were prepared by Mr. Vernon G. Garrett, a certified public accountant, shortly befor the trial of this case at the request of counsel for petitioners. The interal records of Lufkin did not contain any such breakdowns. Mr. Garrett testified at length at the trial and, after a thorough review of the evidence, we have adopted his computations of pretax profit which are set out in our findings of fact. In determining the gross profit of Lufkin on sales and commission transactions with Lufkin International and Lufkin Overseas during 1961 and 1962, Mr. Garrett first reviewed specific identifiable orders to determine the actual gross profit of Lufkin on such orders. To the extent such specific orders were not available, Mr. Garrett used a gross profit figure of 65 percent for parts transactions, *338 which figure was ascertained from a review of Lufkin's gross profit margin on parts over a period of ten years. For all other transactions which could not be identified as either parts or by specific order number, a gross profit figure of 28 percent for 1961 and 30 percent for 1962 was used, which figures were slightly below the gross profit margin of the machinery division of Lufkin on sales to other customers. After determining the gross profit of Lufkin on sales and commission transactions with Lufkin International and Lufkin Overseas, Mr. Garrett reviewed the expense accounts of Lufkin to determine what expenses should be allocated to Lufkin as a result of the transactions with Lufkin International and Lufkin Overseas during 1961 and 1962 to arrive at the pretax profit for Lufkin on these transactions. Mr. Garrett determined that a number of expenses of Lufkin were attributable to Lufkin Overseas' and Lufkin International's transactions and allocated these expenses on a basis he determined to be most appropriate. The pre-tax profit of Lufkin Overseas and Lufkin International for 1961 and 1962 on dealings with Lufkin was taken directly from the financial statements of Lufkin *339 Overseas and Lufkin International. Based on Mr. Garrett's review of the books and records of Lufkin, Lufkin Overseas and Lufkin International for 1961 and 1962, the pre-tax profit of Lufkin's dealings with Lufkin Overseas and Lufkin International was as follows:
(1)
(2)
(3)
(4)
(5)
Pretax Profit
(1) as
(2) as
Lufkin
a %
a %
Year
Lufkin
Overseas
Total
of(3)
of(3)
1961
$ 73,252
$ 67,426
$ 140,678
52.07%
49.93%
1962
77,880
81,173
159,053
48.96%
51.04%
Lufkin
International
1961
$ 78,714
$ 64,612
$143,326
54.92%
45.08%
1962
190,499
167,165
357,664
53,26%
46.74
Expressed in terms of pretax profits as a percentage of total sales of Lufkin, Lufkin International and Lufkin Overseas on export sales during the years in question, the division is as follows: 441 Lufkin and Lufkin
Lufkin and Lufkin
Year
International
Overseas
1961
9.0%
7.5%
9.6%
8.5%
1962
10.8%
9.5%
10.0%
10.4%
Respondent challenges the validity of these computations, specifically charging that (1) Mr. Garrett's conclusions are basedd almost entirely on "assumptions" *340 and "unconfirmed statements" of Lufkin personnel which, if slightly varied, would establish no pretax profit to Lufkin on its transactions with Lufkin Overseas and Lufkin International, (2) Mr. Garrett's examination consisted of only a few specific transactions, some of which showed that no gross profit could have been earned by Lufkin, and (3) the division of pretax profit between Lufkin and its subsidiaries, even if accurate, provides no real measure for determining the arm's-length standard. We find no merit in these allegations. The evidence presented leads us to a contrary conclusion. Respondent points to four orders involving transactions with Lufkin Overseas during 1961 on which Lufkin sustained a loss of $7,862 (assuming a 20-percent commission paid to Lufkin Overseas). Since these four orders constituted one-half of the 1961 commission transactions with Lufkin Overseas, respondent claims that the 20-percent commission rate could not have been at arm's-length. However, respondent fails to point out that these four transactions represented only 23 percent of total identifiable orders of Lufkin Overseas in 1961, which totaled $643,201. The four remaining orders resulted in *341 a gross profit to Lufkin (again assuming a 20-percent commission level) of $71,805. Not only were the four specific orders referred to by respondent for small, low profit units, but they were the only identifiable transactions between Lufkin and Lufkin International and Lufkin Overseas which resulted in losses to Lufkin during 1961 and 1962 and represented only 3.6 percent of total sales and commission transactions with Lufkin International and Lufkin Overseas during 1961 and 1962. Similarly, Mr. Garrett's examination consisted of more than "only a few transactions." Mr. Garrett examined specific orders for 1961 and 1962 for sales by Lufkin on which commissions were paid to Lufkin Overseas which specific orders constituted 83.6 percent and 61.1 percent, respectively, of total sales by Lufkin on which commissions were paid to Lufkin Overseas during such years. Where specific identifiable orders were not availabe, Mr. Garrett assumed a gross profit margin for Lufkin of 28 percent and 30 percent for 1961 and 1962, respectively, slightly less than Lufkin's gross profit margin on sales of the Machinery Division to other customers. Under the circumstances respondent has failed to convince *342 us that the techniques employed by Mr. Garrett are either inappropriate, erroneous or unreasonable. Respondent asserts that, even if accurate, the division of pretax profit between Lufkin and its controlled subsidiaries provides no real measure for determining the required arm's-length standard. We are unable to agree with this position. If the division of pretax profit here is accurate, it is a reasonable distribution and therefore the equivalent of an arm's-length division of pretax profit. PPG Industries, Inc., 55 T.C. 928 (1971); Polak's Frutal Works, Inc. T.C. 953 (1954); Frank v. International Canadian Corp., 308 F. 2d 520 (C.A. 9, 1962). Also compare South Texas Rice Warehouse Co. v. Commissioner, 366 F. 2d 890 (C.A. 5, 1966), affirming 43 T.C. 540 (1965), certiorari denied 386 U.S. 1016 (1967), determining what constituted a reasonable rental charge under section 482. Lufkin urges that while it did not have the benefit of the detailed regulations under section 482, adopted as section 1.482-2 of the Income Tax Regulations on April 15, 1968, the approach taken in establishing both the commissions and discounts *343 between Lufkin, Lufkin International, and Lufkin Overseas, corresponds to the resale price method contained in section 1.482-2 (e)(3), which in the absence of directly comparable uncontrolled sales, is the preferred method under the current regulations and is the method most likely to be found where the parties are unrelated and dealing at arm's-length in similar circumstances. Respondent does not argue that Lufkin must show that its pricing arrangements must show that its pricing arrangements were at arm's length solely by reference to the regulations contained in section 1.482-2 and petitioners have failed to provide a detailed explanation of the application of the "resale price method" to the transactions in question. Therefore, we have not attempted to consider this case within the confines of these regulations. 442 Instead, we have looked at the sound basis for the pricing arrangements set between Lufkin and its controlled subsidiaries and the reasonableness of the division of pretax profits between the members of the controlled group and one further factor which convinces us of the arbitrariness and unreasonableness of respondent's reallocations in this case. We refer *344 to the fact that based on respondent's reallocations both Lufkin International and Lufkin Overseas are placed in loss positions for the year 1961 and only Lufkin Overseas shows a small pretax profit for 1962. We. of course, are cognizant of the fact that these results are based in part upon the allocation of expenses made by Mr. Garrett between Lufkin and its controlled subsidiaries. However, we have adopted Mr. Garrett's allocations as part of our findings of fact and respondent has failed to point out a more proper allocation of expenses. With respect to transactions between Lufkin International and Lufkin Canada, respondent, by recognizing these sales and allowing Lufkin International only a 10-percent discount which is the exact same discount at which it must resell to Lufkin Canada, has forced Lufkin International, regardless of any allocation of expenses, to operate at a loss by virtue of only its direct costs in handing these transactions. In a nearly identical situation in PPG Industries, Inc., supra at page -, we stated: Nor is there any merit in respondent's position that PPGI did not earn any of the profits realized on the sales to petitioner's Canadian *345 subsidiaries and that consequently all of such income is allocable to the petitioner. This contention, revealed by respondent for the first time at the trial, is not supported by the record. Respondent appears to be taking an inconsistent position. On the one hand he admits that PPGI is not a sham corporation and on the other hand he would deprive PPGI of a large segment of its income-producing activities. A bizarre result of respondent's reallocation of all of the income from Canadian sales to petitioner would be to leave PPGI with a total loss from its operations in 1960 and 1961 in the amount of about $265,700. On its face, therefore, respondent's allocation would be unreasonable and arbitrary. While the losses occasioned by respondent's reallocation of gross income may be somewhat smaller than those in PPG Industries, the principle remains the same. Accordingly, for the reasons set forth above, we have concluded that respondent's determination under section 482 is arbitrary, capricious, and unreasonable. In view of this conclusion, it is unnecessary for us to consider Lufkin's contention that the burden of proof should be shifted to respondent as a result of respondent's belated *346 filing of amendments to his answer in each of these dockets, alleging for the first time that he relied upon section 482 in making the adjustments in issue. Respondent has also taken the position that Lufkin International did not qualify as a Western Hemisphere trade corporation under section 921 during the years 1961 and 1962. That section contains two basic requirements: (1) 95 percent or more of the gross income of a qualifying corporation must have been derived from sources without the United States during the 3-year period immediately preceding the close of the taxable period in issue; (2) 90 percent or more of a qualifying corporation's gross income during this period must have been derived from the active conduct of a trade or business. In regard to the first requirement of section 921, the parties appear to be in agreement that the source of income for the rendition of personal services is determined by the place where the services are rendered. Section 1.861-4(b), Income Tax Regs.; [6]British Timken, Ltd., 12 T.C. 880 (1949). With respect to sales of Lufkin equipment in Venezuela, respondent acknowledges that many were the direct result of the promotional activities of *347 Lufkin International's sales engineers in Venezuela. However, it is suggested by respondent that the New York and Tulsa offices of Lufkin also had a role in making Venezuelan sales. The evidence presented indicates that these 443 offices primarily coordinated Lufkin International's field sales activities with the purchasing offices of the major oil companies. There is no support for the contention that these offices actually engaged in activities which made them, as opposed to Lufkin International, directly responsible for certain Venezuelan sales of Lufkin pumping units. *348 Respondent also argues that even if Lufkin International does meet the requirements of section 921(1), it does not meet the requirements of section 921(2) with respect to the active conduct of a trade or business. Respondent contends that this issue is governed by the decision in U.S. Gypsum Co. v. United States, 304 F. Supp. 627 (N.D. Ill. 1969), on appeal (C.A. 7). We find little similarity between that case and the instant case. Respondent admits on brief that there are differences in the two cases. Indeed there are. In U. S. Gypsum a controlled subsidiary took fleeting title to gypsum rock as it fell from a conveyor belt belonging to a related corporation and resold it to another related corporation which owned the ships into which this gypsum rock was being loaded. It was held that this momentary ownership of gypsum rock did not constitute the conduct of an active trade or business. Quoting with approval from the Government's brief in that case, the District Court indicates the extent of the participation of the controlled subsidiary (Export) in the entire transaction: And Galileo taught us from his tower in Pisa that gravity - not Export - caused the gypsum rock *349 to fall from the conveyor on CG's (Canadian's) dock to the stowage of the Gypsum Prince. While respondent asserts that the activities undertaken by Lufkin International in connection with its sales to Lufkin Canada only differ in that the length of time that title was held was extended, we think there are additional differences. Lufkin International took over the selling operations previously performed by Lufkin with regard to Canadian sales. Lufkin International assumed a real risk of loss in connection with its shipments to Lufkin Canada. Lufkin International also bore the administrative costs incurred in connection with the sale of Lufkin products to Lufkin Canada. And Mr. L.A. Little, president of Lufkin International, did visit Canada in 1961 and 1962 for one week periods where he did engage in some sales promotion which benefited Lufkin International to some extent. The sales to Lufkin Canada here are neither sham transactions nor similar to those in U. S. Gypsum, but rather are significantly more analogous to those transactions considered in Frank v. International Canadian Corp., 308 F. 2d 520 (C.A. 9, 1962); Barber-Greene Americas, Inc., supra; *350 Pan American Eutectic Welding Alloys Co., supra; and Commissioner v. Hammond Organ Western Export Corp., 327 F. 2d 964 (C.A. 7, 1964), affirming a Memorandum Opinion of this Court. In each of those cases a subsidiary corporation was formed for the purpose of taking advantage of the favorable tax treatment accorded qualifying Western Hemisphere trade corporations. The subsidiaries purchased products from their parent corporations and resold these products to or through dealers or distributors outside the United States. In passing upon the question of whether this type of activity constituted the active conduct of a trade or business, the Court of Appeals for the Ninth Circuit in Frank v. International Canadian Corp., supra at pages 525-527 stated: Form a citation to the Senate Finance Committees' Report the Commissioner concludes that Congress intended to deny the tax advantages available to § 109 corporations "to domestic corporations which derived their income from passive activities, a non-competitive course of conduct, as in the case at bar." (Emphasis added.) And, contends the Commissioner, the most that can be said for International's *351 role in this case "is that it was a mere conduit for income attributable to the activities of Washington." * * * The undisputed facts, urges the Commissioner, show that International was "inert;" and, therefore, it was clear error for the district court to hold that International was actively engaged in a trade or business. The meaning which the Commissioner contends should be given "active conduct" as used in § 109(b) is, however, contrary to a majority of the authorities. The "active conduct" requirement of § 109(b) is to disqualify corporations which are "inactive" in the sense that they receive investment income rather than business income. And since all International's income came from the sale of chemical products, more than 90% of its gross income "was derived from the active conduct of a trade or business" within the meaning of § 109(b). The Commissioner's argument that international was inactive - or, "inert" - is based on his contentions that (1) Washington had been doing business with 444 Alaska Pine and its predecessor for over twenty years; (2) Washington, not International, performed all the activities "necessary" to the sale of chemicals; and (3) International *352 could not conduct any sales activities since it had no source of supply, customers, plant or employee organization. We consider each in turn. First, the Commissioner argues that because Alaska Pine and its predecessor had been doing business with Washington for over twenty years, International did not actively conduct a trade or business. This argument is without merit. * * * * * * The district court's findings of fact show that Washington had good business reasons for forming International (as a Western Hemisphere trade corporation or otherwise) to handle sales with Alaska Pine. To qualify as a Western Hemisphere trade corporation, the business of the qualifying corporation need not be restricted to new business developed after its incorporation; i. e., it cannot be said that a Western Hemisphere subsidiary cannot be formed to take over business previously done by its parent organization. Polak's Frutal Works, Inc., supra; see also A. P. Green Export Co. v. Unitedd States, Ct. Cl., 1960,, 284 F. 2d 383. Secondly, the Commissioner contends that International was not active within the meaning of § 109 because Washington performed all the activities necessary to the *353 sale of chemicals; i. e., Washington paid certain persons who opened International's mail, typed order blanks for International, and sent one copy of the order to the shipping department and another copy to the invoicing clerk. The Commissioner advanced a similar argument in A.P. Green Export Co. v. United States, supra, but the Court of Claims there held that merely because the parent corporation's employees performed all of the subsidiary's work did not, in and of itself, disqualify the subsidiary as a Western Hemisphere trade corporation. In addition, International, in the case at bar, employed and paid Mr. Nielson who not only kept International's books but also reviewed all paper work, prepared export declarations and customs papers, handled correspondence, and coordinated instructions received from Alaska Pine with Washington's traffic, production, and shipping departments. Moreover, as in the A.P. Green Export case, supra, International here paid a monthly management fee to Washington, part of which was in payment for the routine services which Washington performed for International and which were not paid for in other ways. * * * Lastly, the Commissioner argues *354 that International could not conduct any sales activity since it had no source of supply, customers, plant or employee organization. As has been shown, a parent organization can transfer its selling operations to a subsidiary and the subsidiary can still qualify as a Western Hemisphere trade corporation within § 109. A.P. Green Export Co. v. United States, supra; Barber-Greene Americas, Inc., 1960, 35 T.C. 365; Polak's Frutal Works, Inc., supra. We think the sales made by Lufkin International to Lufkin Canada were not materially different from those made in the above-cited cases and, upon the authority of those cases, we hold that Lufkin International was engaged in the active conduct of a trade or business within the meaning of section 921(2). Accordingly, we conclude that Lufkin International satisfied all of the necessary requirements of section 921 to qualify as a Western Hemisphere trade corporation during the years 1961 and 1962. In order to reflect other adjustments, Decisions will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
*. Excludes used pumping units bought and resold in Venezuela as described above.↩
*. Excludes United States income tax refund not includable in income.↩
*. Tax computed by applying regular corporation rates to net income after deducting special credit of 26.923 percent allowed to western Hemisphere Trade Corporation.↩
*. Tax computed by applying regular corporation rates to net income after deducting special credit of 26.923 percent allowed to western Hemisphere Trade Corporation.↩
2. SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS. In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. ↩
3. SEC. 921. DEFINITION OF WESTERN HEMISPHERE TRADE CORPORATIONS. For purposes of this subtitle, the term "Western Hemisphere trade corporation" means a domestic corporation all of whose business (other than incidental purchases) is done in any country or countries in North, Central, or South America, or in the West Indies, and which satisfies the following conditions: (1) if 95 percent or more of the gross income of such domestic corporation for the 3-year period immediately preceding the close of the taxable year (or for such part of such period during which the corporation was in existence) was derived from sources without the United States; and (2) if 90 percent or more of its gross income for such period or such part thereof was derived from the active conduct of a trade or business. For any taxable year beginning prior to January 1, 1954, the determination as to whether any corporation meets the requirements of section 109 of the Internal Revenue Code of 1939↩ shall be made as if this section had not been enacted and without inferences drawn from the fact that this section is not expressly made applicable with respect to taxable years beginning prior to January 1, 1954.
4. Sec. 1.482-1(b)(1), Income Tax Regs., provides as follows: (b) Scope and purpose. (1) The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer. The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the taxable income from the property and business of each of the controlled taxpayers. If, however, this has not been done, and the taxable incomes are thereby understated, the district director shall intervene, and, by making such distributions, apportionments, or allocations as he may deem necessary of gross income, deductions, credits, or allowances, or of any item or element affecting taxable income, between or among the controlled taxpayers constituting the group, shall determine the true taxable income of each controlled taxpayer. The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.↩
5. See also Johnson Bronze Company, T.C. Memo. 1965-281↩.
6. Sec. 1.861-4(b)↩ Amount includible in gross income. If a specific amount is paid for labor or personal services performed in the United States, that amount (if income from sources within the United States) shall be included in the gross income. If no accurate allocation or segregation of compensation for labor or personal services performed in the United States can be made, or when such labor or service is performed partly within and partly without the United States, the amount to be included in the gross income shall be determined by an apportionment on the time basis; that is, there shall be included in the gross income an amount which bears the same relation to the total compensation as the number of days of performance of the labor or services within the United States bears to the total number of days of performance of labor or services for which the payment is made.